# STATE EX REL. LEECH *v.* BOARD OF CANVASSERS OF CHOTEAU COUNTY.

[Argued December 23, 1892.  Decided December 31, 1892.]

MANDAMUS—*Issuance in vacation by one justice of Supreme Court.*—An alternative writ of mandate may be issued in vacation upon the order of the presiding justice of the Supreme Court.  (DE WITT, J., dissenting.)

SAME—*Original jurisdiction of Supreme Court to issue.*—The Supreme Court has original jurisdiction to issue a writ of mandate.  (*State ex rel. Thompson* v. *Kenney*, 9 Mont. 223; *In re MacKnight*, 11 Mont. 126, cited.)

SAME—*To whom directed—Elections—Returning board.*—Under the Act of March 7, 1892 (2d Sess. p. 299), the members of a county board of canvassers do not necessarily embrace the same officers, but are subject to changes which depend upon circumstances, and therefore, a writ of mandate issued to compel such board to reconvene and canvass the returns from an election precinct which they had excluded, is properly directed to the particular individuals comprising the board, describing them by name, and as constituting the board of county canvassers of election returns for a certain county and State, the particular members of such board at the time in question being the persons against whom obedience must, if necessary, be enforced.

SAME—*Alternative writ—What required to state.*—An alternative writ of mandate which states generally the acts which the parties have omitted to do, and which they are required to perform, is sufficient under section 586 of the Code of Civil Procedure, providing that the writ shall state generally the allegation against the party to whom it is directed.  The word "generally" having the same meaning as the word "general" in section 68 of the Code of Civil Procedure, requiring the summons to contain the "general nature of the action."

ELECTIONS—*Returns—Canvassing board—Mandamus.*—The duties of a county canvassing board are ministerial, and such board has no authority to exclude the returns of an election precinct, regularly made, upon the ground that the voting was shown by affidavits to be illegal, and having done so may be compelled by mandamus to canvass such returns.  (*Pigott* v. *Board of Canvassers of Cascade County*, 12 Mont. 537; *Chumasero* v. *Potts*, 2 Mont. 270, cited.)

SAME— *Canvassing board— Adjournment sine die— Mandamus.*— Where a county canvassing board issued a certificate of election to a candidate for the legislative assembly after unlawfully excluding the returns of a particular precinct, and then adjourned *sine die*, such board may be compelled by mandamus to reconvene and canvass the returns so excluded, and issue a certificate of election to the person shown by a complete canvass to be entitled thereto.

MANDAMUS— *Answer to alternative writ— Defenses.* —A county canvassing board in its answer to an alternative writ of mandate to compel such board to canvass the returns of a particular precinct which it had excluded, is not confined to the reason incorporated in the official record of its proceedings as ground for excluding such returns, but may specify other defenses.

ELECTIONS— *Canvassing board— Defects in returns— Mandamus.* — Where the genuineness and regularity of the returns of an election precinct were not questioned by the county canvassing board at the time of making the canvass, but such returns, having been received through the proper course of the mail, were treated at the time as worthy of full credit, and the names of the candidates for members of the legislative assembly and the number of votes received by each at such precinct could be readily ascertained by such board upon an inspection of the poll-book, but which returns were excluded by such board for a reason not apparent on its face, it is no defense to an alternative writ issued in a mandamus proceeding to compel the board to canvass such returns, that the blank return in such poll-book was not filled in nor the certificate thereto properly attested, as such defects would not have been grounds for rejecting the returns. Section 5 of the Act of March 17, 1891 (Laws 2d Sess. p. 301), providing in substance that a failure to fill out all the certificates in a poll-book, or a failure to perform any other act in the making up of returns that is not essential to determine for whom the votes were cast, is not such an irregularity as to entitle the board to reject the same.

SAME— *Same— Mandamus— Answer to writ.* —An allegation in an answer to an alternative writ of mandate, issued to compel a county canvassing board to canvass the returns of a precinct which it had excluded, stating that it appeared from an inspection of the registration list, and of the list of persons returned as voting at said precinct that sixteen names of persons, naming them, appeared upon the list of persons returned as voting at said precinct, which said sixteen persons did not appear to have ever been registered as voters at said precinct, and no surrendered certificates of registration were transmitted by the judges of election to the clerk of the board of county commissioners in connection with, or as a part of the election returns of said precinct, or in any manner whatever, and it appeared from said returns that said sixteen persons were not entitled to vote at all at said election, presents an issue which should be tried.

SAME— *Check lists and registry certificates— Canvassing board.* —Although no check lists of such precinct or surrendered certificates were ever sent to the county clerk by the judges of election, it was the duty of the board of canvassers to have procured the check lists and such certificates before rejecting the vote of the precinct as returned by the poll-book alone.

SAME— *Registration— Voting— Mispelled names.*—No illegal votes were shown by the returns to have been cast at such precinct where it appeared that the check list contained the names of forty-six voters, five of whom failed to vote; that five electors voted upon county registry certificates, and that the list of voters returned by the poll-book consisted of forty-six names, in sixteen of which there occurred some difference in the spelling of the names as written by the registry agents and by the clerks of election, or a difference occurring by way of using initial letters for the Christian name in one case and writing it at length in the other, or the dropping of an initial, but each of which names could be identified with a name upon the check list.

Original proceeding. Application for alternative writ of mandate to compel the county board of canvassers of Choteau County to reconvene and canvass and count the election returns from Box Elder Precinct and to deliver to relator a certificate of his election as a member of the legislative assembly.

*Decius S. Wade,* and *Ella L. Knowles,* for Relator.

*John W. Tattan, Robert B. Smith,* and *George F. Shelton,* for Respondent.

BLAKE, C. J. — This is an application to the court for the issuance of a writ of mandate to the board of canvassers of the county of Choteau, in this State, directing the board to reconvene and canvass and count the election returns from the Box Elder Precinct, No. 18, in said county; and also commanding said board, and the county clerk of said county, to deliver to the relator, Eugene E. Leech, a certificate of his election as a member of the legislative assembly of the State for said county. The affidavit of said Leech says that he is a resident of said county, and above the age of twenty-five years. That on the eight day of November, A. D. 1892, there were two vacancies in the office of members of the House of Representatives of the legislative assembly of the State for said county. That the relator was a candidate for this office, at the general election held in said county on the said eight day of November, and was nominated, certified, and published for such office, and received a plurality of the votes cast by the qualified electors of said county. That on the nineteenth day of November, A. D. 1892, Charles W. Gray and Edward Dunne were county commissioners of said county, and that the third member of the board of county commissioners did not attend, and Walter J. Miner, the county treasurer of said county, acted with said Gray and Dunne as members of the canvassing board of said county. That said board of canvassers were in session from the said nineteenth day of November until the twenty-third day of said month, and then adjourned. That the return of the precincts in said county in which the polls were open were in legal form, and were presented and received by the board of canvassers. That at said election the following per-

sons were candidates for members of the legislative assembly for said county: Thomas C. Burns, Eugene E. Leech, Albert B. Hamilton, and George T. Sanderson. That, as shown by said returns, and in fact, said Burns received eight hundred and twenty-seven votes; that said Leech received seven hundred and thirty-two votes; that said Hamilton received seven hundred and twenty-five votes; and that said Sanderson received five hundred and sixty-three votes; and that the returns of said votes were regularly made, submitted, and presented to said board of canvassers. It is further stated that said board proceeded to canvass and make an abstract of the votes cast, as returned, for the candidates of the legislative assembly; that said abstract, which is fully set forth, shows that the relator and said Burns and Hamilton and Sanderson received the number of votes above specified; that thereafter, and before the final adjournment of said board, a protest by said Hamilton, and four affidavits relating to said precinct No. 18, were presented; that said board thereupon excluded the returns from said precinct, and refused to canvass and count the same, but executed and signed another abstract of returns and votes cast in said county, exclusive of said precinct; that at said precinct the relator received twenty-nine votes, and said Hamilton received fourteen votes; that by the exclusion of said precinct said Hamilton appears to have received a majority of seven votes in said county over the vote cast for the relator; and that, with the returns of said precinct canvassed according to law, the relator received a majority of seven votes over said Hamilton. It is further stated that said returns from said precinct No. 18 were made in the proper manner and time, and in legal form; that the relator became and is entitled to receive from said board of canvassers and the county clerk of said county a certificate of election to the office of member of the legislative assembly of the State of Montana for the county of Choteau; and that said board and clerk have failed and refused to make, execute, and deliver to the relator the certificate of his election to such office.

The protest of said Hamilton alleges, in substance, that a judge of the election in said precinct No. 18 bribed the electors thereof; that at least twenty-five half-breeds voted at said pre-

cinct; that it is a "fair conclusion, from the facts presented, that every one of them were bribed to vote the Republican ticket; and that, left to themselves, they would have voted the Democratic ticket; . . . . wherefore your protestant demands that the returns from said precinct be set aside, and rejected as wholly unworthy of a place in your returns." The affidavits of John B. Trottier, Isador Trottier, and Elias Shongray are similar in form. It is deposed therein that each affiant is a half-breed, and unable to read and write; that a certain judge of the election fixed their respective tickets at the polls, and gave a card to the affiants; that another party paid ten dollars to the bearer upon the receipt of this card; and that the affiants consider or believe that this money was paid for voting the Republican ticket. The affidavit of Simon Pepin is to the effect that he was informed, and fully believes, that each half-breed who voted the Republican ticket at said precinct at said election received therefor the sum of ten dollars. The affidavit of said Hamilton is to the effect that he has made many inquiries, and believes that twenty-five half-breeds voted at said precinct at said election; that he has conversed with a number of them, and "believes that all the half-breeds that voted there were paid ten dollars each to vote the Republican ticket."

It appears from the record of the proceedings that the said board of canvassers, after the filing of the protest of said Hamilton and said affidavits and the argument of counsel, "decided to strike out and not canvass the returns from said precinct;" that the members signed the abstract of election returns which was made out in accordance with this decision; that it was declared that the persons named in said abstract, who received the highest number of votes, were "duly elected;" and that said Minar and Dunne "constituting a majority of the canvassing board, together with Alfred E. Rodgers, clerk, . . . . proceeded to sign the certificates of election of the persons receiving the highest number of votes for their respective offices, as set forth in the abstract."

The writ of mandate in the alternative was issued and served upon the members of said board of canvassers. The respondents, on the day when they were directed to appear and show cause before this court, filed a motion to quash the writ, upon

the ground that the same had been issued by an order of the chief justice in vacation. During the past twenty years there has not been any amendment to the statutes which would affect this question of procedure. The practice which has prevailed in the Supreme Courts of the Territory and State was followed, and the usual order was made by the presiding justice upon the application, for the purpose of securing a hearing and determination of the controversy by this court. The motion is therefore overruled. The respondents then filed a demurrer to the alternative writ, upon the grounds which will be hereafter examined.

It is asserted that this court has no original jurisdiction to issue the writ of mandate to afford the relief which is sought by the relator. We have given this subject a thorough consideration, and adhere to the view announced in *State* v. *Kenney*, 9 Mont. 223; and *In re MacKnight*, 11 Mont. 126; 28 Am. St. Rep. 451. The respondents maintain that the writ "is directed to certain individuals, and not to the board of canvassers." The following language is used: "The State of Montana to Charles W. Gray, Edward Dunne, and Walter J. Minar, constituting the board of county canvassers of election returns for the county of Choteau, State of Montana, and Alfred E. Rodgers, clerk of the board of county commissioners, and *ex officio* clerk of the said board of county canvassers, greeting." The statute provides that the "alternative writ shall state generally the allegation against the party to whom it is directed, and command such party . . . . to do the act required to be performed, or to show cause. . . . ." (Code Civ. Proc. § 568.) The law creating the board of county canvassers contains this section: "The board of county commissioners of each county is *ex officio* a board of county canvassers for the county, and must meet as a board of county canvassers at the usual place of meeting of the board of county commissioners; and if at the time and place appointed for such meetings one or more of the county commissioners should not attend, the place of absentees must be supplied by one or more of the county officers whose duty it is to act, in the order named, to wit, the treasurer, the assessor, the sheriff, so that the board of county canvassers shall always consist of three acting members. The county canvassing board, so constituted, shall

meet at the office of the county clerk of such county within ten days (Sundays excepted) after each election held under the laws governing general and special elections in this State, to canvass the returns; and the clerk of the board of county commissioners is the clerk of the board of county canvassers." (Stats. 2d Sess. p. 299, § 2.) The duties of the members of the board and its clerk are specifically defined, and the writ states "generally" the acts which the parties have omitted to do, and which they are required to perform. Under the statute, *supra*, the members of the board of county canvassers did not embrace the same officers, but are subject to changes, which depend upon circumstances. At one time they may include the county commissioners, and at another time the treasurer, assessor, or sheriff may be compelled to supply the places of the absentees. In *State's Attorney* v. *Selectmen of Branford*, 59 Conn. 409, the court said: "The writ must be directed to those, and those only, who are to obey it. This is necessary, so that, in case the demand is disobeyed, it may be certain who is to be proceeded against for the contempt." In *Coll* v. *City Board etc.* 83 Mich. 367, the writ was directed to the city board of canvassers of election "and A. G. Kronberg, city clerk of the city of Detroit." It appears from the opinion that the "respondents, composing the board of canvassers, by a vote of thirty-four to twenty declared" certain candidates elected. It is also stated that "each member of the canvassing board is made a party respondent to this proceeding." In *Brown* v. *Commissioners*, 38 Kan. 436, the alternative writ was directed to the county commissioners and county clerk as a board of canvassers. Mr. High reviews the authorities upon this subject, and says: "In cases of mandamus to subordinate courts, to set them in motion, and to compel action upon matters properly within their jurisdiction, on which it is their duty to act, it would seem to be correct practice to direct the alternative writ, either to the court as such, or to the individual judges of whom it is composed. But the direction should be to the particular judge or judges of the court when there are other judges authorized by law to hold the terms of the court, that it may be known against whom the authority to enforce obedience to the writ shall, if necessary, be exercised." (High on Extraordinary Remedies [2d ed.], § 544.) These principles are appli-

cable to the facts before us. The statute does not designate the name by which the board of county canvassers shall sue or be sued, and the direction of the alternative writ is to the particular members of this board, and its clerk, against whom obedience must, if necessary, be enforced. The doctrine of the old authorities respecting the contents of the alternative writ of mandamus has been modified by the Code of Civil Procedure, and the allegation is to be stated "generally," and not specifically. The term "generally" seems to have the same meaning as the word "general" in the Code, which requires the summons to contain the "general nature of the action." (§ 68.) We are satisfied that this writ complies substantially with the statute, *supra*, and that the respondents are thereby notified of the wrongs of which the relator complains, and the relief which he demands.

It is contended, however, that a discretion has been vested in the respondents, and that the writ of mandamus cannot, for this reason, be issued. In the recent case of *Pigott* v. *Board of Canvassers of Cascade Co.* 12 Mont. 537, we decided this point, and held that the duties of respondents are ministerial, under the following sections of the statute: "The canvass must be public, by opening the returns, and determining therefrom the vote of such county or precinct for each person voted for, and for and against each proposition voted upon at such election, and declaring the result thereof." (Stats. 2d Sess. p. 301, § 4.) "In canvassing the returns of the several precincts in the county by the county canvassing board, no return shall be rejected if it can be readily ascertained therefrom the number of legal votes cast for each person named therein." (Stats. 2d Sess. p. 301, § 5.) "The clerks shall set down in their poll-books the names of every person voted for, and, at full length, the office for which such person received such votes, and the number he did receive, the number being expressed at full length; such entry to be made, as near as circumstances will admit, in the following form." (Comp. Stats. div. 5, § 1030.) One of the poll-books of the precinct is comprised in the returns. (Comp. Stats. div. 5, § 1031.) Mr. Justice Knowles, in his concurring opinion in *Chumasero* v. *Potts*, 2 Mont. 270, expresses tersely our conclusions, and it is needless to multiply authorities thereon: "Much might be said in relation to the issues presented in this

proceeding. There are a large number of issues tendered in the answers that go to the point that there was a fraudulent and illegal vote cast upon the subject of the approval of the capital law. This is a question that the canvassers of the return of the abstracts of the votes had nothing to do with. It was no part of their duty to determine what was the true and legal vote cast. What they were required to do was to determine what the abstracts of the vote returned to them showed upon this subject. As they have no right to go behind these abstracts, they have no right to assign as a reason for not canvassing the true abstracts that there was an illegal and fraudulent vote behind them."

We have no hesitation in holding that the foregoing affidavits were received by the respondents without legal authority, and the exclusion of the returns from said precinct upon this ground was invalid.

The next contention in support of the demurrer is that this court does not possess the power to compel the respondents to hold another session after they have adjourned *sine die*, and recanvass the returns of said election, and issue a certificate of election to the relator. It appears that said Hamilton has been declared elected a member of the House of Representatives of the legislative assembly, and that the certificate of his election has been issued by the respondents. This is, in the main, a new question for our tribunal, but there are many adjudications in other courts upon these propositions. We have examined the authorities which uphold the theory of respondents, and cite them without indulging in extensive comments: *Clark* v. *Buchanan*, 2 Minn. 346; *State* v. *Stewart*, 26 Ohio St. 216; *State* v. *Rodman*, 43 Mo. 256; *People* v. *Supervisors etc.* 12 Barb. 217; *Sherburne* v. *Horn*, 45 Mich. 160; *People* v. *Cover*, 50 Ill. 100; *Oglesby* v. *Sigman*, 58 Miss. 502; *Myers* v. *Chalmers*, 60 Miss. 772; *O'Hara* v. *Powell*, 80 N. C. 103; *Swain* v. *McRae*, 80 N. C. 111. The weight of judicial authority, and the sound rule for our guidance, are in conflict with these positions. In *Ellis* v. *Commissioners*, 2 Gray, 370, the writ of mandamus was held to be the appropriate remedy for the relator, although another candidate had been declared to be the county treasurer, and was in possession of the office. In

*People* v. *Rives*, 27 Ill. 241, it was adjudged to be no defense to the petition for mandamus that a certificate of election had been issued, and that the governor had commissioned the competitor of the relator a justice of the peace. In *Brown* v. *Commissioners*, 38 Kan. 436, the board of canvassers refused to count seventeen votes from one township for the relator, and declared that another person had received a majority of the votes cast for county commissioner in the district, and issued a certificate of election accordingly. The board was commanded to count this vote upon the face of the returns, and determined that the relator had been elected, and issued to him a certificate of election. In *State* v. *Wilson*, 24 Neb. 139, it was decided that the writ of mandamus should issue, although certain school trustees had received their certificates of election, and had qualified and entered upon their duties. In *State* v. *Howe*, 28 Neb. 618, this ruling was approved in a mandamus proceeding concerning the office of justice of the peace. In *Smith* v. *Lawrence*, South Dakota, June 19, 1891, 49 N. W. Rep. 7, the court reviewed at length similar questions, and arrived at the same result, where the party had received the certificate of his election as sheriff.

There are two leading cases, which should be carefully weighed, because they affect members of the legislature: In *O'Ferrall* v. *Colby*, 2 Minn. 180, decided in the year 1858, Chief Justice Emmett, for the court, said: "Another position urged by the defense is that, as by the Constitution the senate is made the judge of the election and eligibility of its members, no other tribunal can or ought to take jurisdiction of this case. This position, we think, is sufficiently answered by the fact that this is not a proceeding to try the right of any party to the office of senator, but simply to determine whether the plaintiffs are entitled, at the hands of the defendant, to certificates of election to that office. Nor can our decision in the least affect the question of the election of either of the candidates. That question can be definitely settled by the senate alone. The aid of this court is sought to prevent the consequences of a usurpation of authority on the part of this board of canvassers, and to compel the defendant to do his duty. All that we can do is to arm the parties entitled with the credentials necessary to enable

them properly to assert their rights before the proper tribunal. Whether they, or either of them, were legally elected, is not a question here.    One candidate may be entitled to a certificate of election, while his opponent may have a clear right to the office." In *People* v. *Hilliard*, 29 Ill. 413, decided in the year 1862, Mr. Justice Breese, for the court, said: "Though the House of Representatives is the sole and exclusive judge of the qualifications of its members, this application has no reference whatever to the point of qualifications. Its sole purpose is to procure the requisite evidence, to present to that body, of a *prima facie* right to a seat in it, independent wholly of the question of qualification. It is clear, then, the appropriate remedy is not with the House of Representatives. The only remedy the relator has — the only means by which he can obtain evidence of the right claimed — is by this compulsory writ of mandamus. This is very clear. No other process or proceeding can give the specific relief in the premises. But it is urged that, as the certificate has already issued, the office is filled, and therefore the only remedy is by a contest before the house. Some cases are referred to in support of this position, but it will be seen most of them were applications for a mandamus to admit to an office. This is not such a case. The relator asks not to be admitted to an office, but that evidence of his having been elected to an office shall be furnished him. It is not to turn one man out and put the relator in office that this proceeding is had. A mandamus will not lie for such purpose, and a decision in this case cannot affect the right of another claiming the office. That is for the House of Representatives to determine." (See, also, *State* v. *County Judge*, 7 Iowa, 186; *Clark* v. *McKenzie*, 7 Bush, 523; *Alderson* v. *Commissioners*, 32 W. Va. 454; *Lewis* v. *Commissioners*, 16 Kan. 103; 22 Am. Rep. 275; Paine on Elections, § 919; Merrill on Mandamus, § 185; McCrary on Elections [3d ed.], § 350.) Judge Cooley, in his treatise on Constitutional Limitations, observes: "But we should think the better doctrine to be that, if the board adjourn before a legal and complete performance of their duty, mandamus would lie to compel them to meet and perform it." (Cooley on Constitutional Limitations [4th ed.], p. 785.) Judge McCrary says: "Thus it has been held by the Supreme Court

of Kansas that, where a board of canvassing officers has adjourned after making only a partial canvass of the votes cast, mandamus will lie to compel them to reassemble, and complete the canvass. Upon this question the authorities are not uniform. In New York and Ohio there are decisions holding to some extent the contrary doctrine. But the ruling in the Kansas case is supported by the Iowa decisions. And we think the reasoning of the Supreme Court of Kansas is sound." (McCrary on Elections, p. 156, § 234.)

The demurrer was overruled, and the respondents filed their answer. The relator demurred thereto, and also moved that a peremptory writ of mandate be issued, upon the ground that the answer did not state a good cause for the refusal of respondents to canvass and count the returns from the Elder Box Precinct. We have been embarrassed by the lack of precedents upon a question of pleading. It should be observed that the reasons which controlled the respondents in rejecting the returns from this precinct are set forth in the foregoing protest of said Hamilton, and the accompanying affidavits. They are incorporated in the official record of their proceedings, which is before us. Their attorneys do not justify the action of respondents upon this ground, or offer any excuse of a similar character, but specified in the answer several defenses, which are different from what were relied on by the canvassing board. Are the principles which are applicable to ordinary cases to be followed in this proceeding? Mr. Justice Swayne, in *Railway Co.* v. *McCarthy*, 96 U. S. 267, for the court, said: "Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law." (See, also, *Fisk* v. *Cuthbert*, 2 Mont. 593, and *Newell* v. *Meyendorff*, 9 Mont. 254; 18 Am. St. Rep. 738.) We do not think, however, that the respondents are confined, upon this hearing, to the foregoing reasons. They are required at this time to show cause why they have not done certain acts, and their defenses are thereby enlarged, and cannot be pleaded subject to limitations, which will be pointed out.

It is averred in the answer that the returns from this precinct were not properly certified by the judges and clerks, and that they omitted to fill the following blank in the poll-book: —

"Official Return.   At an election held at the ———— house of ————, in ———— Precinct, in ———— County, and State of Montana, on the ———— day of ————, A. D. 189-, the following named persons received the number of votes annexed to the names of the following described offices."

This document, which was received through the mail by the county clerk of Choteau County, and was before the respondents, is entitled as follows: —

"Poll-book of an election held in Box Elder Precinct, in Choteau County, State of Montana, on the eighth day of November, A. D. 1892, at which time Jno. Henry, David Adams, and A. M. Brough were judges, and Clem Sailor and J. P. Carberry were clerks, of said election, the following named persons voting thereat."

The poll-book contains the oaths of the judges and clerks of election, which were duly subscribed November 8, 1892. The names and numbers of the electors were entered therein by the clerks, and the tally sheets are also recorded.   The certificate at the end is in the following form: —

"Certified by us this eighth day of November, A. D. 1892.
       Attest:

J. P. Carberry, ⎱ Clerks of          A. M. Brough, ⎱ Judges of
Clem Sailor,    ⎰ election.          John Henry,   ⎰ election."
                                     David Adams,

The statute provides for the return and certificate: —

"At an election held at the house of A. B., in the township or precinct of ————, in the county of ————, and the State of Montana, on the ———— day of ————, A. D. 18—, the following named persons received the number of votes annexed to their respective names for the following described offices, to wit: —
Certified by us.                    Attest:
A B ⎱                               M N ⎱
and ⎰ Clerks of election.          O P ⎰ Judges of election.
C D                                 Q R
(Comp. Stats. div. 5, § 1030.)

The mistake in the certificate in this poll-book in the use of the word "attest" occurs in the principal blanks which were furnished to the officers of the precinct by the county. The legislative assembly, at its last session, enacted that such defects should not be grounds for rejecting the returns. "The fact that the returns do not show who administered the oath to the judges of election, or a failure to fill out all the certificates in the poll-book, or a failure to do or perform any other act in or about the making up of the returns that is not essential to determine for whom the votes were cast, shall not be such an irregularity as to entitle the said board to reject the same, but the same must be canvassed *as other returns are canvassed.*" (Stats. 2d Sess. p. 301, § 5.) "If all the returns have not been received, the canvass must be postponed from day to day, until all the returns are received: *provided* that, if the returns from any of the election precincts have not been received by the county clerk fifteen days after such general or special election, it shall be the duty of the said board of canvassers to forthwith send a messenger to the judges of such election precincts, whose duty it shall be to open the ballot-box, and from the returns therein inclosed make a copy of the same, and furnish the messenger with such copy." (Stats. 2d Sess. p. 300, § 3.) The respondents did not appoint a messenger to perform this duty, but treated the returns of Box Elder Precinct as worthy of full credit respecting their contents. The genuineness and regularity of these documents were never questioned or attacked until this answer was filed. The names of the candidates for the House of Representatives of the legislative assembly, and the number of votes which was received by them at this precinct, can be readily ascertained by the board of canvassers upon an inspection of this poll-book.

This allegation appears in the answer: "That it appeared from an inspection of the registration list, and of the list of persons returned as voting at said Box Elder Precinct No. 18, that sixteen names of persons, to wit, Henry F. Schwartz, Henry Brough, John B. Trottier, William Trottier, Frank Trottier, Antoine Trottier, Andre Trottier, John Trottier, Ermine Trottier, J. B. Moture, W. H. Murray, L. K. Devlin, Isadore Trottier, Samuel Pepin, and J. B. La Framboise,

appeared upon the list of persons returned as voting at said
Box Elder Precinct, which said sixteen names did not appear
to have ever been registered as voters at said precinct; and no
surrendered certificates of registration were transmitted by the
judges of election to the clerk of the board of county commis-
sioners in connection with or as a part of the election returns
of said precinct, or in any manner whatever; and it appeared
from said returns that said sixteen persons were not entitled to
vote at all at said election." It is easily understood that cases
may arise in which it would be the duty of the board of can-
vassers to compare the names upon the check lists with those
of the actual voters. This course might be the sole remedy if a
precinct with a small number of electors returned a large number
of votes for candidates for office, exceeding the registration lists.
It is difficult to prescribe a rule which would govern all contro-.
versies of this kind. An extreme illustration of the danger to
be guarded against is shown by the remarkable case of *State* v.
*Stevens*, 23 Kan. 456; 33 Am. Rep. 175.  Mr. Justice Brewer,
for the court, said : "The defendants, for one ground of defense,
return that there were only about eight hundred legal voters in
said county at the date of said election, whereas the returns as
made show a vote of two thousand nine hundred and forty-
seven purporting to have been polled, and that therefore at least
two thousand one hundred and forty-seven of such votes were
fraudulent and illegal, and that by reason thereof it is impossible
to determine and declare the will of the people, or the true result
of such election." It was adjudged that these facts constituted
a defense to the proceeding for a mandamus to compel the can-
vassing board to declare the result of the election in accordance
with such returns.  A majority of the court is of opinion that,
when the pleadings are reviewed, this paragraph of the answer
presents an issue which should be tried.

The demurrer and motion of the relator were overruled, and
the case was heard upon its merits by the court without a jury.
The testimony will be presented in connection with the legal
propositions which have been argued by counsel.  It was proved
that no check lists of the precinct, or surrendered certificates,
were ever sent to the county clerk, and that the board of can-
vassers acted upon the poll-book alone.

In passing upon the demurrer and motion of the relator, we were obliged to review, as admitted, this portion of the answer: "That there was returned with said pretended returns, and as a part thereof, a list of the persons registered at said Box Elder Precinct No. 18." This allegation is contradicted by all the witnesses, including one of the respondents, who verified the answer. There was posted in the office of the county clerk the "verified copy" of the list of electors who had been registered in the Box Elder Election Precinct. (Stats. 16th Sess. p. 129, § 9.) The vote from Box Elder Precinct was canvassed, and then rejected, without an examination being made of said list. It is contended by respondents that the surrendered certificates should have been forwarded to the county clerk by the judges of this election precinct. Conceding that this contention is correct, although the statute is not perspicuous upon this point, it was the plain duty of the board of canvassers, under the statute, *supra*, to procure the checks lists, and such certificates, before the returns were rejected. What, then, appears upon the face of these returns which the respondents should have had before them as to the names of persons alleged not to have been registered? The following table shows such names of the electors as they appear upon the voting list, in the poll-book, and upon the check list and surrendered certificates of the Box Elder Precinct:—

| NAMES OF VOTERS AS SHOWN BY THE POLL-BOOK. | LIST OF VOTERS AS REGISTERED AND SHOWN IN THE CHECK LIST. |
| --- | --- |
| Henry F. Swartz. | Henry F. Schwartz. |
| Henry Brough. | Henry S. Brough. |
| John B. Trottier. | John B. Trochet. |
| Frank Trowtier, | Frank Trochet. |
| Antoine Trowtier. | Antoine Trochet. |
| Ermine Trottier. | Ermine Trochet. |
| John Trowtier. | John Trochet. |
| Alex Trottier. | Alex Trochet. |
| Andrue Trowtier. | Andre Trochet. |
| William Trowtier. | William Trochet. |
| J. B. Moture. | Baptist Moture. |

|  | NAMES OF VOTERS AS SHOWN BY CERTIFICATES OF REGISTRATION SURRENDERED TO THE JUDGES. |
| --- | --- |
| W. H. Murray. | W. H. Murray. |
| L. K. Devlin. | L. K. Devlin. |
| Isadore Trottier. | Isadore Truchot. |
| Samuel Pepin. | Simon Pepin. |
| J. B. La Framboise. | John B. Lafrombois. |

In the comparison of these names the board of canvassers must recognize some presumptions of law and fact, to wit, that the judges and clerks of the Box Elder Precinct performed their sworn duty, and permitted no persons to vote at this election who were not legal voters; and that, under the laws of this State, the names of such voters must be found upon the check lists of the precinct, or the surrendered certificates. It is established by the check lists that there were thereon the names of forty-six voters; that five of this number failed to vote; that five electors voted upon county registry certificates; and that the voting list contains the names of forty-six voters. The spelling of the names of the voters by the clerks in the poll-books is unimportant if the officers of the precinct are satisfied concerning their identity. The statute provides: "When the judges of election shall have good reason to believe, or when they shall be informed by a qualified elector, that the person offering to vote is not the person who was so registered in that name, the vote of such person shall not be received until he shall have proved his identity as the person who was registered in that name." (Stats. 16th Sess. p. 132, § 14.) Under our mode of conducting elections the misspelling of names by the clerks must frequently take place. A forcible example of this assertion is afforded by a glance at the names of the foregoing voters who produced the county certificates. What should have been the legitimate conclusion of the canvassing board from these documents? There is only one name upon the check list resembling, respectively, Henry F. Schwartz, Henry Brough, or J. B. Moture. The surnames of the family written Trochet, or Trowtier, or Trottier, with their Christian names, and initial

letters of John B., William, Frank, Antoine, Andre, John, Alex, and Ermine, which are given in the poll-book and check lists, can be identified. The small number of names (forty-six) upon the check list is a circumstance to be remembered in trying to reach a satisfactory determination. There is no foundation for the deduction pleaded in the answer, that there were upon the list of voters the names of sixteen, or even one, person, who had no right to vote at Box Elder Precinct. It is therefore ordered that the peremptory writ of mandamus be issued.

HARWOOD, J. (*concurring*). — The determination of this proceeding by an order for the issuance of a peremptory writ of mandate was concurred in by all the members of this court, but upon a question of practice raised, and as to what constitutes "election returns" under the provisions of the statute, there appears to be some difference of views. At the commencement of the proceeding, on the affidavit of the relator, an order was made by the chief justice of this court, at chambers, in vacation, for the issuance of the alternative writ of mandate, returnable to the court, for hearing and determination by the court at a time designated. The question of practice comes by way of motion to quash the proceeding, on the ground that the court has no jurisdiction thereof for hearing, because the preliminary order for the alternative writ was issued by one justice instead of being issued by the court, convened and sitting as such. The writ of *mandamus*, as defined by the statute of this state, is a mandate by a court of competent jurisdiction "to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station; or to compel the admission of a party to the use and enjoyment of a right or office to which he is entitled, and from which he is unlawfully precluded by such inferior tribunal, corporation, board, or person." (Comp. Stats. Mont. § 566, Code Civ. Proc.) The statute provides that the proceeding for mandamus shall be commenced "upon affidavit, on the application of the party beneficially interested," and prescribes two methods of bringing on the hearing of the application before the court. One method prescribed is by the applicant giving at least ten days' notice to the party about to be complained of that application for the writ will be made to the court at the time and place stated in

the notice.   (Code Civ. Proc. § 569.)   This brings on the final
hearing of the application by the court, and, if a writ is granted
on such hearing, the same is made final and peremptory.   The
other method prescribed by statute for bringing on the hearing
of the application is the issuance of an alternative writ on the
affidavit and application of the party beneficially interested.
This preliminary process is addressed to the party complained
of, and states "generally the allegations against him," and
requires of him the performance of the duty which appears from
the affidavit to have been wrongfully neglected; or that he
"show cause before the court at a specified time and place, why
he had not done so." (Code Civ. Proc. § 568.)   The effect of
this process is merely formal and initiatory, for the statute, after
prescribing these two methods of calling upon the alleged delin-
quent party to appear before the court upon the hearing, pro-
vides that: "The writ shall not be granted by default.   The
case shall be heard by the court, whether the adverse party
appear or not." (Code Civ. Proc. § 569.)   By this statute it
seems plain that, in view of the legislature, the alternative writ,
while called a writ, was not regarded as anything more than
the initiatory process, in case that method of bringing on the
hearing was used; for that writ is issued before even a notice is
given to the adverse party, and if, in view of the law, that was
regarded in the sense of an effective writ, there would be a
peculiar contradiction in the statute, because, as we have just
seen, the statute provides that "the writ shall not be granted
by default.   The case shall be heard by the court, whether the
adverse party appear or not."   It is significant, too, that the
proceeding which comes on for hearing after service of the alter-
native writ or notice is called in the statute a "case," and pro-
vision is made for the effective writ of command after a hearing
of the case by the court, and not otherwise.   These provisions
of the statute, directing the practice in this proceeding, places
the alternative writ, as to its effect, on the same basis as the
notice served by the applicant on the adverse party.   The office
of each process is to bring the proceeding on for hearing.   The
adverse party may, if he is in fact neglecting to perform such
duty, "which the law specially enjoins," voluntarily perform
the same, on receiving either the notice or the alternative writ,

and answer that he has performed such duty; or he may neither perform the act sought to be compelled, nor answer the alternative writ or notice, nor otherwise appear to show cause for the alleged neglect. He may wait, with the assurance of the statute that on the return of these formal proceedings a hearing must be had by the court, and no final and effective command will be granted without such hearing. Whether the proceeding was instituted by notice given by the applicant before making the application, or by way of the alternative writ sent out as a process of the court, the proceeding is to be heard and determined by the court, after the adverse party has been given the opportunity to answer, and no peremptory command can issue without such hearing and final determination by the court. The question raised is whether it is proper practice, in the initiation of these proceedings, under these provisions of law, to allow the alternative writ to be issued as the court's process, on the order of one justice, as has been the practice, or whether the court must hear the application before the adverse party is notified, and before the real hearing of the proceeding, in order to send out the preliminary process to bring on the hearing.

It is made plain from the provision of the statute that the alternative writ amounts to no more, in effect, than to cite the party complained of to appear and show cause, if any he has, why he should not be compelled by mandate to perform the duty in question. Therefore, to hold that the court may not, in its practice, under the provisions of this law, allow the preliminary process to issue upon the order of one justice, is holding the power of the court very narrow in the realm of mere formal practice. If the court may not, through the order of one of its justices, allow the preliminary process to be issued to bring on the hearing, the power of the court in this regard is limited by such construction below that of a private suitor in the proceeding. The applicant may bring on the hearing by notice, on his own motion, without any order or process of the court, and that notice accomplishes the same purpose as the alternative writ. Respondent's counsel have cited no authority to support the point they contend for. It is urged on hypercritical and extremely narrow construction of terms. The Constitution provides that this court "shall have power, in its

discretion, to issue, hear, and determine" the writ of mandamus, among other writs specified. This is exactly what the court has done in this proceeding; and no one affirms, nor is it held, that the peremptory writ of mandamus can be issued without hearing and a final order by the court. It does not follow therefrom that the court shall not, through the order of one of its justices, allow the preliminary process to go forth, which effects nothing more than to bring on the hearing. The fact that the Constitution provides that the District "Courts and the judges thereof shall have power also to issue, hear, and determine writs of mandamus," etc. (art. viii, § 11), does not, in my opinion, tend to establish the proposition that this court must not allow the preliminary process to go out through the order of one justice to bring on the hearing; nor does the provision of the Constitution that one justice of this court may "issue, hear, and determine" writs of habeas corpus and of *certiorari* in certain cases, have a tendency, in my opinion, to restrict the power of this court in the orderly and convenient shaping of its practice so as to avoid waste of time by superfluous formality in the issuance of the preliminary process to bring on a hearing before the court, in matters where the court must give full hearing before any effectual order can be made. The tendency of those liberal provisions for the use of said writs by one justice of this court and by a lower court, or judge thereof, in the administration of justice, seems to me to point in the other direction. (*State ex rel. Macklin* v. *Rombauer*, 104 Mo. 619.) For these reasons I concur in overruling the motion to quash the alternative writ issued in this proceeding. In view of the fact that the practice pursued in this proceeding has been so long established, and followed by able judges, administering the law under the same statute now prevailing, and that such practice, as to the issuance of the preliminary process, does not affect any substantial rights of the parties, I should not regard the point raised as worthy of extended treatment, had it not become the occasion for dissension in the course of this proceeding.

The most important point which arose in this proceeding, in my opinion, was the question as to what documents the county canvassing board may examine as constituting the election returns from the several precincts. An important part of such

returns is one of the two poll-books kept by the clerks of election, wherein they enter the name of each elector as he appears, and his vote is admitted by the judges; and also showing the result of the canvass of the votes of such precinct by the judges and clerks thereof at the close of the election; which poll-book, duly certified and attested, as required by law, is returned to the county canvassing board. That part of the returns is provided for by sections 1019–1030, inclusive, of the Compiled Statutes. Subsequent to the passage of that statute an act was adopted by the legislative assembly providing for the registration of all qualified electors, prior to the time of holding each general election; and providing that votes can be received from electors only on a showing of their previous registration, as required in said act. (Sess. Laws, 1889, p. 124.) This law provides that the fact of previous registration must be shown by a "check list" for each voting precinct, which is a list of the registered voters of such precinct, taken from the official register of the district; or, if the name of the elector whose vote is offered, does not appear on such "check list," his vote can only be received on his production and surrender of a certificate of registration, issued by a registry agent, under seal of his office. Two classes of such certificates of registration are provided for in the Registration Act. One class comprise certificates issued to qualified electors, who, on account of a vacancy in the office of the registry agent of the district wherein they reside, are authorized to qualify before the registry agent of another registration district of the county, and receive from the latter agent a certificate of registration; and upon the production and surrender of such certificate the vote of the elector holding the same is admitted in his own precinct. This class of certificates is provided for in section 3 of the Registration Act, which reads as follows: "It shall be the duty of the chairman of the board of county commissioners of any county in Montana, when he shall have received notice from any responsible citizen of the death, disqualification, or resignation of any registry agent, after the opening and prior to the closing of the books of registration, to immediately, without giving notice, appoint some competent person to fill such vacancy, and it shall be the duty of such person so appointed to qualify within two

days after receiving notice of such appointment. Should such person so appointed fail to qualify within the time herein provided, voters may, upon producing evidence as to their right to vote, be registered in any other district in said county, and any person so registered in any other district shall, upon presentation and surrender of a certificate of registration, signed by the registry agent of said district, be considered a legal voter in the precinct of the district in which he is a resident: *provided*, this section shall not be so construed as to interfere with the right of the full board of commissioners to make such appointment, except in cases herein provided. If any person applies to be registered in any district other than the one in which he resides, and is entitled, upon proof, to a certificate of registration, as provided for in this section, such applicant, in addition to the proof required by this act to entitle him to registration, shall take and subscribe to an oath before the registry agent in substantially the following form: —

"————, Montana, ————, 18—.

"I do solemnly swear that I make this application for registration in District No. —— of ————, county of ————, Montana, because there is no registry agent within election district No. ——, which is the district where I reside and am entitled to vote.

"Subscribed and sworn to before me this —— day of ————, 18—.        ———— ————, Registry Agent."

Whereupon such person shall receive from the registry agent of such district a certificate, which said certificate shall bear the registry seal, and be substantially as follows, to wit: —

"Registration Certificate: I hereby certify that —— is a citizen of the United States, or has declared his intention to become such, of the age of —— years, and has been a resident of Montana for the past —— consecutive months, and a resident of ————, —— County, for —— months, and of the precinct for more than —— days, and that he is in all respects a qualified registered elector under the laws; and I further certify that the reason he applies for and that I grant this registration certificate is because within election district No. ——, where he resides, there is no registry agent; and I

further certify that he is, under the laws, entitled to vote in the —— precinct of election district No. ——, —— County, Montana.

"Witness my hand and seal of office in election district No. ——, —— County, Montana.

[SEAL.]    "—— ——, Registry Clerk.

"Election District No. ——, —— County, Montana."

The other class of certificates is called in the Registration Act, "State Registry Certificates," and comprise those issued to an elector after such elector has been registered in the district where he resides, and his name is erased from the register upon his request, and a State certificate of registration is granted to him by the registry agent. Upon presentation and surrender of such certificate the elector holding the same may be registered in another place, where he has established his residence in time to become a qualified voter at the next ensuing election. On being so registered in the latter district, such elector surrenders his registration certificate, and his name goes into the check list of the precinct where he is last registered. But it is further provided in section 11 of the Registration Act that "in case any registered and qualified elector who has had delivered to him a State registration certificate pursuant to this section, and who has for good cause been unable to register the second time anywhere within Montana before the date of the closing of the registration books, may offer to vote at any precinct within the county where he resides and was registered to vote, or in any precinct in the county, but not the precinct where he lives and was registered, the judges of election shall challenge such person peremptorily, and put to him under oath such questions making him prove his identity as the person to whom such certificate is issued, and such other questions as may seem to them proper in order to fully test such person's qualifications; and if he be disqualified for any cause, or fail or refuse to answer any question concerning his qualifications, or if he fail to identify himself, he shall not be permitted to vote; but if he be qualified he shall surrender his certificate, and the judges shall enter his name on the lists, and he shall be entitled to vote." By these provisions it appears that votes may be received of electors whose names are not on the check list of the precinct, but

such votes must be received on certificates of registration, issued as provided in the act, and surrendered to the judges of election.

Now, in relation to the returns of election (in addition to one of the poll-books of the precinct, to be returned to the county canvassing board, as provided by the general election law), the Registration Act provides as follows: "The copy of the official register, together with the 'check lists' for election precincts, as herein provided, shall be carefully preserved and duly certified to by the registry agent, and delivered, together with affidavits of objection, to some one of the judges of election in each election precinct, at a time not later than the day next preceding that on which such election is to be held, and such 'check lists' shall be carefully preserved, and any surrendered certificates which may have come into the hands of such registry agents pursuant to this act, and after election they shall be transmitted by the judges of election to the clerk of the board of county commissioners in connection with and as a part of the 'election returns,' as provided by law." (§ 10, Registration Act.) It seems plain from the provision that the legislature, in requiring the registration of all qualified electors, and that no votes should be received except upon evidence of previous registration, shown by the check lists, or certificates of registration surrendered to the judges, and in further expressly providing that the check lists and certificates of registration which come into the hands of the judges from the registry agent "shall be transmitted by the judges of election to the clerk of the board of county commissioners, in connection with, and as part of, the election returns, as provided by law," intended to place before the canvassing board, in the returns, the documentary evidence showing the registration of the electors appearing from the poll-book to have been allowed to vote at such precinct. This provision was evidently made to carry out the spirit and purpose of the Registration Act. The return of the evidence of registration with the poll-book, as part of the returns, would show at once that the vote appearing from the poll-book to have been received and returned was a registered vote, and would thus constitute in some measure a voucher for the regularity of the returns shown by the poll-

book.   But the legislature, while expressly requiring the check lists and certificates of registration which came into the hands of the judges from the registry agent to be returned as "part of the election returns," omitted, in the details, to require such other certificates of registration on which votes were received by the judges of election to be returned also with the check list.   Here is a slight lapse or omission in the matter of details. But is not the intention of the legislature plainly visible?   Why provide that the check lists (which would undoubtedly include the names of the great majority of electors lawfully voting at the precinct), and also such certificates of registration as the judges received from the registry agent, should be returned to the canvassing board "as part of the election returns?"   If this manifests an intention that the returns should be accompanied by the evidence of registration whereby the judges admitted the votes appearing from the poll-book to have been cast, then that intention should be given effect in construing and applying the law; and that construction would simply be that, because of this manifest intention, the canvassing board should be allowed, not only to look at the check lists, but also to look at certificates of registration surrendered to the judges, on which votes were admitted, for the check list is not the entire evidence of registration on which votes may be lawfully received.   This construction allows the provision of the Registration Act, as to such returns, to have effect.   Any other construction makes vanity of the provision for sending up the check lists and certificates of registration received by the judges of election from the registry agent, and makes that provision operate to mystify, obscure, and cast doubt or suspicion on the returns shown by the poll-book, because part of the names on the poll-book may not appear from the check list to have been registered, and would be unaccounted for as registered, unless shown to be registered by an examination of the certificates of registration upon which they were admitted.   A construction in conformity with the manifest intention of the legislature would construe the provision to mean simply that the county canvassing board may look at, "as part of the election returns," the evidence of the registration of the electors whose votes were received, as appears from the poll-book, and such evidence

would in a great measure vouch for the genuineness, honesty, and regularity of the vote returned, as having been received in conformity with the registration law.   The statute of this State provides that in construing a statute "where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all."   (Code Civ. Proc. § 630.) Another rule laid down by our statute is that, "in the construction of a statute, the intention of the legislature, and, in the construction of the instrument, the intention of the parties, is to be pursued if possible."   (Code Civ. Proc. § 631.)

It being clear that the legislature, by providing that check lists and certificates of registration mentioned should constitute "part of the election returns," intended that the evidence of registration on which the votes were received as returned by the poll-book should be subject to examination by the canvassing board, as part of the returns, the majority of this court held that such manifest intention should have effect.   This was an important point in the case.   The canvassing board alleged in its answer as cause for rejecting the returns from said precinct, in effect, that the names of sixteen persons appeared upon the poll-book as having been allowed to vote at said precinct, who did not appear to have been registered; and that "it appeared from said returns that said sixteen persons were not entitled to vote at all at said election."   If this was true, more than one third of the forty-six votes returned by the poll-book from said precinct were fraudulent, and did not represent votes cast by registered electors, as appeared from examination of the registration lists.

On demurrer to the answer it was contended that the canvassing board had no right to look at all the evidence of registration on which votes were received, as part of the returns, to see whether the list of electors recorded in the poll-book as having voted were registered.   The demurrer was overruled by a concurrence of a majority of the court, and the respondents were thus allowed to substantiate by proof the allegation of their answer as to the great discrepancy between the registration lists and the vote returned by the poll-book.   But on the hearing the canvassing board utterly failed to establish such allegation. On bringing in the check lists and certificates of registration

surrendered to the judges of election, it was found that these documents showed the registration of a greater number of electors than was returned in the poll-book as having voted at said election. There was no such thing as the registration list falling short of the voting list by sixteen names, as alleged, or by any number whatever. The only support offered for that allegation was the pointing out of some difference in the spelling of names as written by the registry agent and by the clerks of election, or a difference occurring by way of using initial letters for the Christian name in one case and writing it at length in the other, or the dropping of an initial, as "Henry Brough," in the registration list, and "Henry S. Brough" as recorded by the clerks of election in the poll-book. However slight was such difference, it was seized upon as ground for alleging that the elector as to whom it occurred was not registered. This was a strong allegation to make and verify by oath on such a pretext. It carried with it the direct implication that the officers of such election precinct had committed a crime by receiving votes from persons not registered, to the extent of more than one third of all the votes received, if intentionally done; and this in a neighborhood where only forty-six votes were cast, and very likely every voter was personally known to some of the election officers. But it was disclosed on the hearing, by the evidence of Mr. Rodgers, clerk of the board of county commissioners, and of the canvassing board, that in the rejection of the returns from said precinct neither the check list nor the certificates of registration were examined or sought to be examined by the canvassing board, nor were the returns rejected on the grounds of any discrepancy in the spelling of the names as appeared in the registration list and on the poll-book, nor was any such ground considered in the rejection of said returns. The returns were rejected on the untenable grounds set forth in certain affidavits presented to the canvassing board, which the canvassing board had no jurisdiction to inquire into or determine. These features of the case are sufficiently treated in the main opinion prepared by the chief justice. The purpose of this concurring opinion was to more fully treat the question of practice as to the issuance of the alternative writ of mandamus on the order of one justice of this

court, and the question as to what constitutes election returns under the provisions of the statute.

DE WITT, J. (*dissenting from the order denying the motion to quash the writ, on the ground that it was not issued by the court; that point being passed as decided, of opinion that the demurrer to the answer should be sustained, and peremptory writ thereupon issued*).— I am of opinion that one justice in vacation had no authority to order the writ issued. The majority of the court held that the writ was · properly issued. That point being decided, and being now the law of this court, I come to the demurrer to the answer, and the accompanying motion for the peremptory writ forthwith. That demurrer and that motion, I think, should have been sustained. The result of these views is, of course, that I am of opinion that the peremptory writ should have issued without going further in the hearing than overruling the demurrer to the answer. I will state the reasons for my conclusions upon these two points :—

On the third day of December, 1892, the October term of this court adjourned without day. On the sixth day of December, 1892, the December term opened. On the fifth day of December, 1892, the alternative writ in this matter was issued. It is therefore a fact that the writ was issued in vacation. How it came to be issued appears by the following indorsement on the application :—

"Upon reading the foregoing affidavit and application of Eugene E. Leech, it is ordered that the clerk of the Supreme Court issue a writ in the alternative, in accordance with the prayer of the said Leech, returnable before the Supreme Court upon Friday, the ninth day of December, A. D. 1892, at ten o'clock A. M. HENRY N. BLAKE,

"Chief Justice of the State of Montana.

"Dated December 5, 1892."

Upon the return day, December 9th, the respondents, the canvassing board, moved to quash the writ for the reason that it was issued without authority. The provision of the Constitution in reference to the issuance of the writ of mandamus (§ 3, art. viii.) is, in full, as follows: "The appellate jurisdiction of the Supreme Court shall extend to all cases at law and in

equity, subject, however, to such limitations and regulations as may be prescribed by law. Said court shall have power, in its discretion, to issue and to hear and determine writs of habeas corpus, mandamus, *quo warranto, certiorari,* prohibition, and injunction, and such other original and remedial writs as may be necessary or proper to the complete exercise of its appellate jurisdiction. When a jury is required in the Supreme Court to determine an issue of fact, said court shall have power to summon such jury in such manner as may be provided by law. Each of the justices of the Supreme Court shall have power to issue writs of habeas corpus to any part of the State, upon petition by, or on behalf of, any person held in actual custody, and may make such writs returnable before himself, or the Supreme Court, or before any District Court of the State, or any judge thereof; and such writs may be heard and determined by the justice or court or judge before whom they are made returnable. Each of the justices of the Supreme Court may also issue and hear and determine writs of *certiorari* in proceedings for contempt in the District Court, and such other writs as may be authorized by law to issue." It seems to me clear that this writ was not issued by the court, for the court, according to section 5, article viii. of the Constitution, "shall consist of three justices, a majority of whom shall be necessary to form a quorum;" and this writ was not ordered issued by three justices, or a quorum, but by one justice. (See *Hobart* v. *Hobart,* 45 Iowa, 501; *Lewis* v. *Hoboken,* 42 N. J. L. 377.) As I understand the matter as before us on the motion to quash, it is simply whether the Constitution gives to one justice, in vacation, the authority to order this writ issued. It is my opinion that the words of section 3 do not give this authority to one justice. That view is fortified by reading section 11 of the same article, in which the Constitution gives to the District. Courts, and the judges thereof, power to issue, hear, and determine writs of mandamus, etc. In the District Courts the judges are expressly given this power. In the Supreme Court a justice is not given this power. The distinction in the two courts, it appears to me, is of some significance. Section 3 of article viii. says expressly that the court shall have power to issue, hear, and determine writs of habeas corpus, mandamus,

and the other writs named. There is the power of the court clearly defined. Then, in the same section, comes a special grant of power to the justices; that is, that each of the justices shall have power to issue, hear, and determine two of the writs, which are named in the general list above, that is, the writ of habeas corpus, and the writ of *certiorari* in proceedings for contempt in the District Court. It would seem that a writ of habeas corpus and a writ of *certiorari* in contempt in the District Court were of some special urgency, and I think it apparent that they are urgent writs. The writ of habeas corpus does, and the writ of *certiorari* in contempt may, involve the immediate personal liberty of the citizen. Therefore I can see a reason why the facility for the issuance, hearing, and determining of these writs should be extended, and why this power is given to a justice, in addition to the power given to the court.

These two writs — that is, habeas corpus, and *certiorari* in contempt — are singled out from the general list of writs mentioned in section 3, article viii., and the power is given to a justice to issue, hear, and determine them. Why so distinguish them from other writs, among which is mandamus, unless the distinction means something? The Constitution says that the court may issue, hear and determine all the writs. The Constitution says that a justice may issue, hear, and determine the writs of habeas corpus and *certiorari* in contempt. I think it is conceded that a justice may not hear and determine a writ of mandamus. But the words "issue, hear and determine" are used together in section 3, article viii. The same construction that holds that a justice may not hear and determine, would hold that he may not issue, the writ. It may be suggested that this is an alternative writ, and that, while one justice may not issue a peremptory writ, he may issue the alternative. But the alternative writ is a writ of mandamus. In the Constitution neither the word "peremptory" nor "alternative" is mentioned. All that we find mentioned is the "writ of mandamus," and that writ may be issued by the court only. I do not, therefore, understand where the authority is found in the Constitution for one justice to issue an alternative writ any more than a peremptory writ. Nor does the statute help it. (Code Civ. Proc. tit. 13, ch. 2.) The peremptory and alternative writs are there

described; but no distinction is there made as to the authority
to issue either.   The statute (§ 568) says that "the writ shall be
either alternative or peremptory;" that is, the alternative is a
writ.   The writ may be issued by the court only.   (Const.
art. viii. § 3.)   Perhaps the alternative writ accomplishes noth-
ing more than the notice provided for in section 569, chapter
2, title 13 of the Code of Civil Procedure.   If the alternative
writ is nothing more than a notice, why go to a justice for it?
Why not go to the clerk?   But the clerk may not issue it.   (*Peo-
ple* v. *Brooks*, 57 Ill. 142.)   The peremptory writ shall not be
granted by default, but the case must be heard.   (§ 569.)   So
I see no cause for importing into the Constitution a construction
that a justice may issue the writ, for the hearing and determi-
nation must be by the court; and nothing, from this point of
view, is accomplished by an alternative writ that would not be
by a notice.   I see no necessity or policy in giving the Consti-
tution such construction, even if the words of that instrument
gave any authority for that construction.   But, after all, it is as
clear to my mind that the court only may issue the writ as it is
that the court only may hear and determine it finally.   Such
are my views as to the power of one justice to issue the writ.
I think the writ should have been quashed.

But, it being decided otherwise by the majority of the court,
and also having gotten beyond the matters raised upon the
demurrer to the writ, I hold the following opinion as to the
demurrer to the answer of respondents:—

The respondents filed an answer, which is their showing of
cause why they, as the canvassing board of Choteau County,
should not be required to count the vote of Box Elder Pre-
cinct.   The answer sets up that votes were bought at that pre-
cinct, that some of the voters were aliens, and other matter
which is not necessary to recite in detail, to the effect that, if
true, many of the votes at that precinct were illegal.   Matter
of this nature, if true, would, of course, be competent and per-
tinent in an election contest (which this proceeding is not), a
contest prosecuted in a court to determine the title to an office
other than that of legislator, or a contest prosecuted before a
house of the legislature to determine the right of a member to
a seat in such house.   But, as is held in *Pigott* v. *Board of*

*Canvassers of 'Cascade Co.* 12 Mont. 537, and by every other court that ever uttered a syllable upon the subject-matter of this sort, frauds, irregularities, illegal votes, and corrupt practices, back of the apparent result upon the face of the returns, cannot be inquired into by a canvassing board, and constitutes no showing of cause why the board should not be required to count and declare the apparent result of the vote. The only matter in the answer, which, to my mind, is worthy of notice, is the following allegation: "That it appeared from an inspection of the registration list, and of the list of persons returned as voting at said Box Elder Precinct No. 18, that sixteen names of persons, to wit, Henry F. Schwartz [giving the names of fifteen others], appeared upon the list of persons returned as voting at said Box Elder Precinct, which said sixteen names did not appear to have ever been registered as voters at said precinct; and no surrendered certificates of registration were transmitted by the judges of election to the clerk of the board of county commissioners in connection with, or as a part of, the election returns of said precinct, or in any manner whatever; and it appeared from said returns that said sixteen persons were not entitled to vote at all at said election." Respondents contend that by this allegation it appears that sixteen persons voted at Box Elder Precinct who were not entitled to vote, and that this appeared upon the face of the returns, and therefore could be noticed by the canvassing board. Whether, if all this be true, it authorized the board to apply the remedy of casting out the whole vote of the precinct, it is not now necessary to decide. But did it appear upon the face of the returns that these sixteen persons were not entitled to vote? I will examine respondent's allegations from the point of view, of course, on the demurrer, that they are all true. Concede it to be true, then, as alleged, that these sixteen persons did not appear to have been registered as voters at that precinct; also that no surrendered certificates were transmitted by the judges of election to the board of canvassers, does it even then appear by the returns that these sixteen persons were not entitled to vote? That they were not entitled to vote is what must appear by the returns, in order to authorize the board to take cognizance of the fact, if it be a fact. What had the board before it as returns?

The registration list, for one thing.    Consider it to be the fact that these sixteen persons did not appear thereon; so far, then, it appeared that they had no right to vote.    What else had the board?    "The surrendered certificates which may have come into the hands of the registry agent." (§ 10, Registration Law.)    Consider it to be the fact that these sixteen persons did not here appear; so far, then, it appears that they had no right to vote.    But had they the right to vote in any other manner if they were not on the registration list of the precinct, and were not among the names on "surrendered certificates which had come into the hands of the registry agent?"    Section 11 of the Registration Law answers this inquiry.    I will not cite that section in full.    (See p. 131, Laws 16th Sess.)    It provides that a registered voter may have his name taken off the official register, and have issued to him a State registration certificate. Upon this State certificate he may be registered in another election district.    If he does not so re-register, then upon certain conditions and showing, as set out in section 11, to the judges of election, on election day, he may vote upon his State certificate, without re-registration.    This State certificate upon which he votes is to be surrendered.    (§ 11.)    It is not provided that this surrendered certificate shall be forwarded to the canvassing board, or be a part of the election returns.    (§§ 10, 11.)    Therefore, the sixteen persons named in respondent's answer could have voted on State certificates, under the provisions of section 11.    If they voted on State certificates, the following facts must be noticed: Their names would not appear upon the registration list of the district in which Box Elder Precinct was, or upon the registration list of any other district in Choteau County, or elsewhere, because the names must have been stricken off in order to obtain the State certificate.    Again, their names would not appear upon "surrendered certificates which may have come into the hands of the registry agents" (§ 10), because they had not re-registered.    (§ 11.)    So, by an examination of either the registration list or the surrendered certificates required to be returned to the canvassing board, would it appear to the canvassing board that such persons were not entitled to vote; whereas the fact is, they would be entitled to vote upon their State certificates, surrendered on election day (and not to the registry agent, as provided

in section 10), which State certificates it is not provided shall be sent to the canvassing board, or be part of the returns.   Therefore, it did not appear by those papers that are made part of the returns that these sixteen persons were not entitled to vote, and, for all that appears on the returns, they were as fully entitled to vote as any person on the registration list.   Therefore, as it did not appear upon the returns that these sixteen persons were not entitled to vote, it was not a matter, even if true, that the canvassing board could, or now can, inquire into.   Therefore, the matter set up by the canvassing board, which I have quoted and discussed, was not a showing of cause why the board should not count the vote of Box Elder Precinct.   Consequently, the demurrer to the answer should have been sustained.   The answer, then, being out of the way, the peremptory writ should have issued.   I think that the registration law should provide that State certificates, voted on and surrendered at the time of voting, should be sent in to the convassing boards as part of the returns.   The omission so to provide was a grave error, and one to be corrected by the legislature, if it sees fit.   I do not find that it is now so provided in the law.   In fact the law clearly does not so provide.   The only method by which I can see that the law could be construed as so providing is to hold that it ought to so provide; and because it ought to, it does. I concede that it ought to.   But I am not yet prepared to hold that what I think a legislature ought to do I shall say it has done.   Holding the views that I venture to entertain as to the demurrer to the answer, I see no occasion to express any opinion as to the proceedings in the case subsequent to the overruling of that demurrer.