TERRITORY ex rel. SULZER v. CANVASSING BOARD.

(First Division.   Juneau.   March 20, 1917.)

No. 1593–A.

*(Syllabus by Editorial Staff.)*

1. MANDAMUS ⬤⟿151(1)—PARTIES—NECESSARY PARTIES.

On petition for mandamus by one candidate for delegate to Congress from Alaska to compel the canvassing board to reject certain returns and issue a certificate of election to him, the rival candidate, while a proper, is not a necessary, party.

2. MANDAMUS ⬤⟿165—DEMURRER TO ANSWER—PRESUMPTION.

Where the territory of Alaska was a formal party plaintiff to a petition for mandamus to compel the canvassing board to reject certain returns in an election for delegate to Congress, the people being to an extent interested, though the proceeding is not an election contest, it will be presumed that the Attorney General, who was present, if he deemed their interests jeopardized, would have objected to the sustaining of a demurrer to the answers of respondents.

3. MANDAMUS ⬤⟿64—ISSUANCE—VOLUNTARY SUBMISSION TO JURISDICTION.

Where all members of the canvassing board of the territory of Alaska, including the Governor as a member of such board, voluntarily submitted to the jurisdiction of the court in a proceeding for mandamus to compel the rejection of returns, the question whether the Governor is subject to mandamus cannot be raised.

4. MANDAMUS ⬤⟿64—OFFICERS SUBJECT TO.

Where two members of the canvassing board of the territory of Alaska, which was composed of the Governor and two others, were subject to mandamus, and there was no statute providing that the action of the board should be unanimous, the writ may be issued, though the Governor was not subject to mandamus.

5. ELECTIONS ⬤⟿258—CANVASSING BOARD—MAJORITY.

A majority of a canvassing board is a lawful quorum, and may act for the board, unless the statute requires unanimity.

6. MANDAMUS ⬤⟿3(4)—OTHER REMEDY.

Mandamus to require the canvassing board of the territory of Alaska to reject returns in an election for delegate to Congress, and to issue the certificate of election to one candidate, will not be denied, because contest may be had before the House of Representatives; such contest not affording the relief sought by the writ.

⬤⟿See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. MANDAMUS ⬅→3(4)—PROCEEDINGS—INSTITUTION BY COURT.

Mandamus to compel the canvassing board of the territory of Alaska to reject certain election returns cannot be denied, on the ground that, if the returns be insufficient, mandamus should be brought against the election officers for fuller returns; the court having no power to initiate such proceedings.

8. MANDAMUS ⬅→7—WRIT—ISSUANCE.

The issuance of a writ of mandamus is largely discretionary with the court, but it is an abuse of discretion to deny the writ in a proper case.

9. MANDAMUS ⬅→74(4)—CANVASSING BOARD—REJECTION OF RETURNS —DENIAL.

Mandamus to compel the canvassing board of the territory of Alaska to reject returns from certain precincts, with respect to the election for delegate to Congress, cannot be denied, on the ground that the returns from such precincts were counted and certificates of election based on the counting of such returns issued to candidates for the House of Representatives of Alaska, and that the rejection of such returns would cause inconsistency.

10. MANDAMUS ⬅→70—ISSUANCE OF WRIT—CANVASSING BOARD.

The canvassing board of the territory of Alaska, while to an extent bound to construe the election laws of the territory, cannot for that reason, as to matters wherein its duties are plain, be deemed a quasi judicial body, not subject to the writ of mandamus.

11. STATUTES ⬅→227—CONSTRUCTION—MANDATORY OR DIRECTORY STATUTES.

A mandatory provision in a statute is one the omission to follow which renders the proceedings void, while a directory provision is one the observance of which is not necessary to the validity of the proceedings.

12. STATUTES ⬅→227—CONSTRUCTION—MANDATORY OR DIRECTORY— INTENT.

Whether a particular statute is mandatory or directory does not depend upon its form, but upon the intention of the Legislature, to be ascertained from the entire act, its nature, its object, and the consequences that would result from construing it one way or another.

13. STATUTES ⬅→227—CONSTRUCTION—MANDATORY STATUTES.

When a particular provision of a statute relates to an immaterial matter, as to which compliance is a mere matter of convenience, it will be deemed directory; but when a fair interpretation of a statute, which directs acts or proceedings to be done in a certain way, shows that the Legislature intended a compliance with such provision to be essential, it must be regarded as mandatory.

---

⬅→See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

14. STATUTES ⚖227—CONSTRUCTION—MANDATORY STATUTES.

Statutes which confer upon a public body or officer power to act for the sake of justice, or which confer power to perform acts which concern the public interests, will be construed as mandatory, though the language is permissive.

15. STATUTES ⚖227—CONSTRUCTION—MANDATORY STATUTES.

Where the provision of a statute is of the very essence of the thing to be done, it is mandatory.

16. STATUTES ⚖227—CONSTRUCTION—MANDATORY STATUTES.

When the terms of a statute are such that they cannot be made effective to the extent of giving each and all of them some reasonable operation, without interpreting the statute as mandatory, such interpretation should be given.

17. ELECTIONS ⚖198—STATUTE—CONSTRUCTION—MANDATORY.

When a statute expressly or by fair implication declares any act to be essential to a valid election, or that an act shall be performed in a given manner, and no other, such provisions are mandatory and exclusive.

18. ELECTIONS ⚖161—BALLOTS—CONSTRUCTION—STATUTE.

As elections are contrivances of government, which prescribe who are electors and how they may express their will, and it is a legitimate exercise of power to prescribe the description of the ballot which shall be used, Australian ballot statutes, being designed to preserve the secrecy of the ballot, and to prevent fraud, intimidation, and bribery, should, in view of the previous abuses, be construed as mandatory, for, if not so construed, the abuses against which they were directed may continue.

19. STATUTES ⚖195—CONSTRUCTION—EXCLUSION.

The expression of one thing in a statute is the exclusion of all others.

20. ELECTIONS ⚖162—BALLOTS—MANDATORY STATUTE—OFFICIAL.

Sess. Laws 1915, c. 25, § 1, declares that the clerks of the district court shall prepare ballots for use in their respective divisions. Prior to this time, every person voting, or some private person, had prepared for him the ballots used. Section 2 prescribes the form of the ballot, while section 3 declares that this ballot shall be headed "Official Ballot," and provides for stubs on the ballot, to be torn therefrom to identify the same as an official ballot before being placed in the box. Section 10 declares that the words "Official Ballot," indorsed by the clerk of the court, shall appear on the outside of every ballot; and sections 17 and 19 respectively provide that each voter shall be given an official ballot on entering the voting place, with which he shall retire to the booth or screen, and there mark the same, and that when a ballot is marred by the voter he may receive a second, and, if necessary, a third, but no more, while any voter

⚖See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

who is blind, or otherwise incapable of marking his ballot, may demand that the judges of election assist him, and this the judges shall do. Section 21 declares that, in any precinct where no official ballots have been received, the voters are permitted to write or print their ballots; while sections 24, 30, 34, and 38 prescribe election offenses, making it a misdemeanor for election officials to mark ballots with a distinguishing mark, or for any one to unlawfully print, distribute, or have in his possession official ballots. *Held*, in view of the provisions for distribution of official ballots, and that the word "official" means derived from the proper office or officer, the statute is mandatory, and official ballots must be used, unless none have been received.

21. ELECTIONS ☞162—BALLOTS—STATUTE—PROVISO.

Section 21 above quoted is not an exception to the statute, but is a proviso.

22. ELECTIONS ☞162—BALLOTS—PROVISO—BURDEN OF PROOF.

One justifying the use of unofficial ballots under Sess. Laws 1915, c. 25, § 21, declaring that, in any precinct where no official ballots have been received, the voters are permitted to prepare or print their own ballots, has the burden of proving that no official ballots were received; the section being a proviso and the absence of such proof being equivalent to prima facie evidence that the case did not fall within the proviso.

23. ELECTIONS ☞248—RETURNS—WHAT ARE.

The question as to what papers constitute the official returns is purely a matter of statutory regulation.

24. ELECTIONS ☞253—RETURNS—REJECTION.

Where election returns are false upon their face, and show a reckless disregard of the terms of the statute, they should be disregarded.

25. ELECTIONS ☞259—RETURNS—REJECTION.

Comp. Laws 1913, § 402, declares that the election board of each polling place, as soon as the polls are closed, shall immediately publicly proceed to open the ballot boxes and count and canvass the votes cast, and they shall thereupon, under their hands and seals, make out in duplicate a certificate of the result of such election, specifying the number of votes cast for each candidate, and they shall then immediately, carefully, and securely seal up in one envelope one of said duplicate certificates and one of the registers of votes, all the ballots cast, and all affidavits made, and mail such envelope, with said papers, to the Governor of Alaska at his place of residence. The return from a precinct contained the certificate of the election board as to the number of votes cast, the register of votes, and nonofficial ballots corresponding to the number of votes cast. *Held*, that as, under the returns which were sent to the Governor as a member of the canvassing board, the board is to canvass the whole of

the return, and not simply a part of the return, the returns from the precinct must be rejected; it appearing that the ballots cast were all nonofficial ballots, instead of official ballots, as prescribed by statute.

26. ELECTIONS ⟨☞⟩259—RETURNS—REJECTION.

In such case, as there was no certificate showing that no official ballots were received, which under Sess. Laws 1915, c. 25, § 21, would have justified the use of nonofficial ballots, such ballots cannot be counted on the theory that there is a presumption that election officials did their duty, and merely omitted to prepare or transmit the certificate that no official ballots had been received, for the statute makes the certificate a condition precedent to the counting of nonofficial ballots.

27. ELECTIONS ⟨☞⟩259—BALLOTS—NONOFFICIAL BALLOTS.

In such case, as the Legislature has power to prescribe the conditions as to voting, the nonofficial ballots cannot be counted on the theory that to reject them would disfranchise all the voters at the precinct.

28. UNITED STATES ⟨☞⟩14—DELEGATE TO CONGRESS—ELECTION CONTEST.

A certificate of election as delegate to Congress from Alaska is not final, but the election contest may be finally determined by the House of Representatives.

29. ELECTIONS ⟨☞⟩3—FRANCHISE—REGULATION.

The elective franchise is not one of the natural rights of man, but has always been hedged about with some restrictions of positive statutory enactments; elections being a contrivance of the government, which prescribes who are electors, how they may exercise their will, and a description of the ballot which shall be used.

30. ELECTIONS ⟨☞⟩248—RETURNS—CONSIDERATION.

Only such papers as the statute requires may be regarded as election returns, and hence, where Comp. Laws 1913, § 402, made no provision for the return of certificates, save with the original papers, a certificate or affidavit by the election officials of a precinct, made after the returns were filed, that no official ballots were received, cannot be considered.

31. ELECTIONS ⟨☞⟩250—RETURNS—CERTIFICATE.

Under Comp. Laws 1913, § 396, requiring the judges of each election precinct to make the return under their hands and seals, and providing that one duplicate of their certificate and the register of votes shall be sent to the clerk of the court, and the other duplicate and all ballots shall be sent to the canvassing board, a certified copy of a certificate made by the election clerk, not certified by the election judges, cannot be canvassed.

⟨☞⟩See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

32. MANDAMUS ☞164(3)—PROCEEDINGS—RETURN.

An allegation in a petition for mandamus, not denied by the answer of the respondents, may be taken as admitted.

33. ELECTIONS ☞250—RETURNS—REJECTION—IRREGULARITIES.

As there are three judges of election, and a majority can act, a certificate setting forth that no official ballots were received cannot be rejected, because it appeared that one of the three judges swore the other two, it appearing that he signed the oath form also, for that would amount at most to a mere irregularity.

34. MANDAMUS ☞74(4)—ELECTION RETURNS—ALLOWANCE OF WRIT.

On petition for mandamus to compel the canvassing board to reject certain returns in an election for delegate to Congress from Alaska, and to issue the election certificate to petitioner, where the answer of respondents set forth the number of votes received by petitioner and his opponent, and that the board had finished the canvass of votes and was about to, issue the certificate to petitioner's opponent, the writ cannot be denied, it appearing that the returns attacked were insufficient, and, if they were not counted, petitioner would have a majority, on the ground that there were defects in other returns not challenged by the pleadings, which would give petitioner's opponent the majority.

Petition by the Territory of Alaska, on the relation of Charles A. Sulzer, for an alternative writ of mandamus against the Canvassing Board for the Territory of Alaska, consisting of J. F. A. Strong, Charles E. Davidson, and John F. Pugh. On demurrer to answers. Demurrer sustained.

John R. Winn and J. A. Hellenthal, both of Juneau, for plaintiff.

John Rustgard, of Juneau, as amicus curiæ.

JENNINGS, District Judge. This is a proceeding by mandamus to compel the canvassing board, consisting of J. F. A. Strong, Governor, Charles E. Davidson, surveyor general, and John F. Pugh, collector of customs, of the district of Alaska, to reject—i. e., not count—the votes or alleged votes from certain precincts for the office of delegate to Congress from Alaska, and to issue to Charles A. Sulzer a certificate of election to said office.

The petition for the alternative writ alleges that the returns from the precincts of Choggiung, Deering, Nizina, Nushagak, Utica, and Bonnifield were not entitled to be canvassed or counted, because said returns plainly show that no official bal-

lots were used and do not show any reason for the nonuse of official ballots; that the returns from the precinct of Vault were not entitled to be counted, because not properly authenticated. The petition further avers that, if the alleged votes from the above-mentioned precincts are not counted, Charles A. Sulzer will plainly appear to be entitled to the certificate of election to said office, instead of James Wickersham, to whom the canvassing board was about to issue the certificate.

On the filing and presentation of said petition the alternative writ was duly issued and duly served.

All the members of the canvassing board duly answered said writ, but all did not join in one answer. Collector Pugh filed his answer, admitting all the allegations of the petition and writ, and expressing his entire willingness to do the things commanded in the writ, but stating that, as he was a minority member of said board, he was "powerless in the premises." Governor Strong and Surveyor General Davidson joined in one answer, the allegations of which are sufficiently stated at a later point in this decision.

All the defendants appeared without counsel. Mr. Davidson, besides filing his joint answer aforesaid, appeared in person.

The plaintiff moved for judgment on the pleadings, but the court refused to consider the matter on such motion, deeming it better to take it up on demurrer to the answers; whereupon plaintiff demurred ore tenus to the answers. The court advised the canvassing board to secure counsel, whereupon Mr. Davidson made the following statement:

"Your honor, we have no interest in it any more than we would like the law point decided, and we have made our answer the best we could, and we have no other interest any more than to obey the orders of the court, whatever they may be."

The court thereupon inquired if Judge Wickersham was represented at this hearing, and, being answered in the negative, stated that it would hear the oral argument of plaintiff in favor of the demurrer, and would be glad to consider any argument that any friend of Judge Wickersham might wish to make, or any brief he might choose to file at that time or at a later date.

It is to be regretted that Judge Wickersham has not intervened herein. He is a proper party, but probably not a nec-

essary party. At present, as the court is informed, he is absent from the territory, and the date of his return thereto is problematical. Owing to the near approach of the extra session of Congress, a situation is presented necessitating action by the court without too long delay. I believe, however, that his interests have been looked after by Mr. Rustgard, who has filed a brief herein in which, although the author expressly disclaims any authority from Judge Wickersham, the points against the demurrer are presented with great force and clearness; and I cannot see how Judge Wickersham's interests could be any better presented, were he a formal party and here protesting against the sustaining of the demurrer.

The people, too, can be said to be interested in the matter. This is true, however, in a limited sense only. It is not true in the sense that the mandamus, if sustained, would, could, or might result in the seating or unseating of one who was not or who was the people's choice. That question is not involved here as this is not a proceeding to settle a contested election. Their interests, whatever their nature, would naturally be looked after by the Attorney General. The territory is a formal party plaintiff, although that is not necessary under our Code. The Attorney General was present in court at the argument of the demurrer. The court would willingly have considered anything he might have said on the subject. It is a fair presumption that, if he had thought that the demurrer was not well taken and that the interests of the people were about to be jeoparded, he would not have remained silent.

The court will say, however, that in considering the demurrer it has considered all possible aspects of the case, the same as if all persons however interested were formal parties.

### A. Mandamus.

The points raised by Mr. Rustgard relate mostly to the propriety of the remedy, and will be adverted to first, because they are of a nature that makes their primal consideration the most logical way in which to approach the questions involved.

The first point raised by him is to call attention to the inartificialness of the pleadings. The point is well taken, but nevertheless there is enough in the pleadings and stipulations to make a case in court and to call for action by the court, and in view of the matters and things set up in the answers of the

5 A.R.—39

canvassing board and the attitude of the canvassing board, as disclosed by said answers and by the statement of Mr. Davidson, the court cannot do otherwise than decide the question involved; and this it will do without too strict an adherence to established forms of procedure, especially in view of the fact that the President has called an extra session of Congress for an early date, and it is important that the person entitled to the certificate of election should present himself on that date, and that the contest of election, if any such there shall be, before the House of Representatives, may be initiated and concluded at the earliest possible moment, to the end that Alaska may be represented by her duly chosen representative, whoever that may be.

A second point raised by Mr. Rustgard is that mandamus will not lie to compel the Governor to do any act, either ministerial or discretionary. Nearly all the authorities as to this point have referred to mandamus by a state court against a state governor, and they proceed mostly on a consideration of the threefold division of the functions of government. It may well be doubted whether they would govern the actions of a court as to the appointed executive of a territory, where no such constitutional division prevails either in theory or in practice. Even as it is, the authorities are very conflicting. The court, however, does not feel that there is any need of passing on the question here for the following reasons:

(a) All the members of the board have voluntarily submitted themselves to the jurisdiction of the court by the filing of answers, in none of which is such question raised, and they seem more desirous of having the case decided upon the merits or demerits of their action as a canvassing board than of standing on technicalities. That abundantly appears from the statement of Mr. Davidson, and where that is the case the question as to whether the Governor can be mandamused is not to be considered. State v. Board of Inspectors, 6 Lea (Tenn.) page 21.

(b) Even if mandamus could not run against the Governor as being the chief executive of the territory, it would run against Davidson and Pugh, the two remaining members, constituting the majority. The Governor is but one of the three constituting the board, and we have no statute requiring that the action of the board shall be unanimous. As said in the

case of Huidekoper v. Hadley, 177 Fed. 12, 100 C. C. A. 406, 40 L. R. A. (N. S.) 505:

"The reason why the Governor cannot be coerced by mandamus is that he needs no such coercion. He is conclusively presumed to be willing to perform all his executive duties. His constitutional obligation is to see that the laws of the state shall be faithfully executed * * * and his oath of office requires him to support the Constitution and demean himself faithfully in office. * * * The very reasons which exempt him from liability to the writ of mandamus are the ones which insure the performance of his duty as a member of the board."

Not only is this theoretically true, but the answer in this case shows that it is actually so. It is not meant to draw any invidious distinction between the disposition of the Governor and that of the other members of the board, for in this regard their answer is practically the same. I take it for granted that all are willing and anxious to do their duty, if only their duty is made plain.

The opinion in the case cited concludes with the following:

"Accordingly, we think the writ of mandamus may lawfully be awarded to secure action by a statutory quorum of the board in this case when circumstances are such that the entire membership cannot be reached by that writ." 177 Fed. 13, 100 C. C. A. 407, 40 L. R. A. (N. S.) 505.

It is true that decision uses the words "statutory quorum," but the law is well settled that in performing public duties a majority of a board is a lawful quorum and may act for the board, unless the statute requires unanimity. 37 Cyc. 1087, note 43, and cases cited.

A third point raised by Mr. Rustgard is that mandamus will not lie because there is a remedy by contest before the House of Representatives. This contention fails to appreciate the true object and purpose of the action.

The object of this proceeding is to obtain the certificate of election—that is, prima facie evidence. It is not to put one man out and put the plaintiff in. A mandamus will not lie for such purposes as that, for that is for the House of Representatives to determine; but no other process or proceeding can give the specific relief which plaintiff claims to be entitled to here.

"The remedy which will suspend mandamus must be one which is competent to afford relief upon the very subject-matter in question, and which is equally convenient, beneficial and effectual." 28 Cyc. 171, 172.

In the case of O'Ferrall v. Colby, 2 Minn. 180 (Gil. 148), the court said:

"Another position urged by the defense is that, as by the Constitution the Senate is made the judge of the election and eligibility of its members, no other tribunal can or ought to take jurisdiction of this case. This position, we think, is sufficiently answered by the fact that this is not a proceeding to try the right of any party to the office of Senator, but simply to determine whether the plaintiffs are entitled, at the hands of the defendant, to certificates of election to that office. Nor can our decision in the least affect the question of the election of either of the candidates. That question can be definitely settled by the Senate alone. The aid of this court is sought to prevent the consequences of a usurpation of authority on the part of this board of canvassers, and to compel the defendant to do his duty. All that we can do is to arm the parties entitled with the credentials necessary to enable them properly to assert their rights before the proper tribunal. Whether they, or either of them, were legally elected, is not a question here. One candidate may be entitled to a certificate of election, while his opponent may have a clear right to the office."

In the case of People v. Hilliard, 29 Ill. 413, the court say (opinion by Breese, C. J.):

"Though the House of Representatives is the sole and exclusive judge of the qualifications of its members, this application has no reference whatever to the point of qualifications. Its sole purpose is to procure the requisite evidence, to present to that body, of a prima facie right to a seat in it, independent wholly of the question of qualification. It is clear, then, the appropriate remedy is not with the House of Representatives. The only remedy the relator has —the only means by which he can obtain evidence of the right claimed—is by this compulsory writ of mandamus."

See, also, State v. Board of Commissioners, 13 Mont. 23, 31 Pac. 879, to same effect.

A fourth point mentioned by Mr. Rustgard is that if the returns of the election board to the canvassing board are insufficient, mandamus should be brought against the election officers for fuller returns. But, even if so, no mandamus was brought by the canvassing board or any one else against the election board. This court cannot, of its own accord, bring a

mandamus; the canvassing board took the returns as they were, and the question which confronts this court here is: What did those returns show?—not what they might have shown, if amended.

It is shown at another place in this decision that the power of considering new or amended returns is a matter of statute.

Another point advanced is that, as the writ of mandamus is a discretionary writ, the court ought not to issue it in this case.

It is true that the issuance of a writ of mandamus is largely discretionary with the court, but it would be an abuse of discretion to deny the writ in a proper case. Atchison v. Commissioners, 12 Kan. 127; Neu v. Voege, 96 Wis. 489, 71 N. W. 880.

Another point is that the board, counting the precincts questioned herein, has issued certificates of election for candidates for the House of Representatives of Alaska, and that for it to refuse to count said precincts in the matter of the election of a delegate to Congress would be inconsistent, and that for the court to compel them to do so "would be to invite political 'confrères' to secure certificates issued to some of their numbers to whom the alleged erroneous returns are favorable and then have the returns eliminated as to those to whom they are found unfavorable." The answer readily suggests itself, and it is this: The court cannot consider what the board has or has not done in the case of other candidates, nor what the "political confrères" or "political opponents" of any of the interested parties may or may not have done, or do or do not intend to do; for such things are not pleaded and are not before the court, nor is it apparent how such things could be material if pleaded.

If the board has taken any such action as that, the possibility of which is suggested by Mr. Rustgard, it is likely that the person against whom the action was taken would, if he had thought proper, have come before the court asking the relief which the plaintiff here is asking, or have contested the matter before the House of Representatives of Alaska, which convened on March 5th. If he has done neither, it but argues that he did not care to do so. But whether he did or did not do

either or both of these things, the person entitled to the certificate for delegate should not be prejudiced in his application on account of the action or nonaction of others in cases concerning themselves. He stands on his own rights, or falls on account of the lack of rights. All that has come before this court is the application of plaintiff, and the sole question is: "Is the plaintiff entitled to the writ?"

Another point made by Mr. Rustgard is that, as the canvassing board would necessarily have to construe statutes, therefore their duty is quasi judicial and involves discretion, and they cannot be mandamused in matters of judgment; but as to that point the Supreme Court of the United States very aptly says:

"Every statute to some extent requires construction by the public officer whose duties may be defined therein. Such officer must read the law, and he must therefore, in a certain sense, construe it in order to form a judgment from its language what duty he is directed by the statute to perform. But that does not necessarily and in all cases make the duty of the officer anything other than a purely ministerial one. If the law direct him to perform an act in regard to which no discretion is committed to him, and which, upon the facts existing, he is bound to perform, then that act is ministerial, although depending upon a statute which requires, in some degree, a construction of its language by the officer. Unless this be so, the value of this writ is very greatly impaired. Every executive officer whose duty is plainly devolved upon him by statute might refuse to perform it, and when his refusal is brought before the court he might successfully plead that the performance of the duty involved the construction of a statute by him, and therefore it was not ministerial, and the court would on that account be powerless to give relief. Such a limitation of the powers of the court, we think, would be most unfortunate, as it would relieve from judicial supervision all executive officers in the performance of their duties, whenever they should plead that the duty required of them arose upon the construction of a statute, no matter how plain its language, nor how plainly they violated their duty in refusing to perform the act required." Roberts, Treas., v. U. S., 176 U. S. 231, 20 Sup. Ct. 379, 44 L. Ed. 443.

I have no doubt that mandamus is the proper remedy provided the pleadings, which on this demurrer must be taken as true, make out a case showing that the plaintiff is clearly entitled to the relief sought, and, that being the holding, I will proceed to a consideration of the merits of the remaining questions.

## B. Remaining Questions.

These questions may be epitomized in one inquiry, to wit:

Was it the plain duty of the canvassing board not to count the returns from the precincts questioned in the pleadings, to wit:

| Name of Precinct. | Wickersham. | Sulzer. |
|---|---|---|
| Choggiung | 25 | 3 |
| Deering | 10 | 6 |
| Nizina | 7 | 2 |
| Nushagak | 10 | 3 |
| Utica | 13 | 4 |
| Bonnifield | 3 | 1 |
| Vault | 8 | 2 |

The proper solution of that inquiry depends upon the answer to one subsidiary question to wit: Is the act of the Legislature of 1915 providing for an official ballot, and for a certain return to be made in case no official ballots were received by the election board, mandatory or simply directory? If mandatory, then the canvassing board had no choice but to reject; if directory only, then it did have discretion to reject or to count. If mandatory, then the demurrer should be sustained; if directory, then the demurrer should be overruled and the proceedings quashed.

### Statutes—When Mandatory.

When is a statute mandatory, and when is it directory? That question is fully answered in 36 Cyc. 1157, and many authorities are there cited upholding the text. To analyze those authorities or to add to them would but prolong this opinion to a greater length than I have at present time to devote to the matter. Suffice it to say, the principles laid down are truisms in the law. Cyc. says:

"A mandatory provision in a statute is one the omission to follow which renders the proceeding to which it relates illegal and void, while a directory provision is one the observance of which is not necessary to the validity of the proceedings. Whether a particular statute is mandatory or directory does not depend upon its form, but upon the intention of the Legislature, to be ascertained from a consideration of the entire act, its nature, its object, and the consequences that would result from construing it one way or the other.  *  *  *  When a particular provision of a statute relates to some immaterial matter, as to which compliance with the statute is a mere matter of

convenience rather than substance, or where the directions of a stat-
ute are given merely with a view to the proper, orderly, and prompt
conduct of business, the provision may generally be regarded as di-
rectory. When a fair interpretation of a statute, which directs acts
or proceedings to be done in a certain way, shows that the Legisla-
ture intended a compliance with such provision to be essential to the
validity of the act or proceeding, * * * then the statute must be
regarded as mandatory. * * * Statutes which confer upon a
public body or officer power to act for the sake of justice, or which
clothe a public body or officer with power to perform acts which con-
cern the public interests, or the rights of individuals, although the
language is permissive merely, will be construed as imposing duties
rather than conferring privileges, and will therefore be regarded as
mandatory." 36 Cyc. 1157.

We might, however, add this:

"Where the provision of a statute is of the very essence of the
thing *. * *. to be done, it is * * * mandatory." Hope v.
Flentge, 140 Mo. 390, 41 S. W. 1002, 47 L. R. A. 806. Apollo v. Clep-
per, 44 Pa. Super. Ct. 396.

And this:

"When the terms of a statute are such that they cannot be madₜ
effective to the extent of giving each and all of them some reasonable
operation without interpreting the statute as mandatory, then such
interpretation should be given on it." Offield v. Davis, 100 Va. 250,
40 S. E. 910.

And this:

"Since the first consideration of the state is to give effect to the
expressed will of the majority, it is directly interested in having
each voter cast a ballot in accordance with the dictates of his indi-
vidual judgment. Recognizing the principles first stated, the courts
have uniformly held that when the statute expressly or by fair im-
plication declares any act to be essential to a valid election, or that
an act shall be performed in a given manner, and no other, such pro-
visions are mandatory and exclusive." Mauck v. Brown, 59 Neb. 382,
81 N. W. 315.

## Australian Ballot.

Striving, then, to get at the legislative intent in enacting the
Australian ballot laws, we inquire: What was the cause of
the legislation? What evil was there to be remedied? How
was it sought to remedy it? What is the purpose of the acts,
and how will that purpose be affected by the construction
put upon them? For we must bear in mind that in the con-
struction of a statute the legislative intent must be made ef-

fective, if it can possibly be done without doing violence to the plain terms of the act.

The system of voting which prevailed in this country before the introduction of the Australian ballot was fairly alive with opportunities for the grossest frauds, and those opportunities were too often improved by ardent partisans or skillful and designing manipulators. Our so-called elections "smelled to Heaven." They seldom expressed the free choice, the unbought and uncowed will, of the electors. All too often the political boss, the interested employer, the bribe giver, or others wielding sinister influence, were able to enforce their will upon weak or needy voters, and to easily ascertain whom among their henchmen or dependents to reward and whom to punish. There was crying need that the whole rotten system of open voting should be abolished. There was but one way to conquer the evil, and that was to tear up the noxious weed, root and branch—to so fix it (1) that the voter voted in secret, not with some Svengali standing over him; (2) that he should know who the candidates were and be free to choose between them, and not have some ready-made ballot with the name of only one candidate thrust into his hands; and (3) that no one should know for whom he voted so that none could reward or punish him for his vote. There could be no halfway measures—no compromise. This system, first adopted in Australia, went through the usual course of all reforms—first laughed at and hooted to scorn, denounced as impracticable, expensive, cumbersome, unfair, etc.; then gradually creeping into favor as one by one the objections were found to be untenable, until at last, as commonwealth after commonwealth tried it and found it good, it burst into a full fruition of usefulness, so that now there is scarce a state or territory in the Union where it does not prevail. These being the evils of the old system sought to be remedied, this being the instrument with which to remedy them, the Legislatures deliberately adopting this remedy and hedging it about with all manner of safeguards, even making it a crime in the officers to fail to observe it, it seems to me that it is idle to say that its essential terms are not mandatory, but are only directory. The official ballot and the secret booth are the very essence of the system; they are the things that make the remedy truly a remedy; without them the evil sought to be remedied is not remedied. The official ballot is just as

essential, if not more so, than the secret booth; for what does it avail of protection for the voter if he is to be given a ready-made ballot containing a name or names which he must vote, or, by writing in other names, thus betray his identity by his handwriting? The simple cross of the Australian system, made by the voter on the official ballot in front of the name of the person for whom he wishes to vote, made with no eye overlooking him, betrays no identity, and gives the freest choice—nay, it gives the only free choice. It is not of the essence of the system that the official ballot should be exactly in the form prescribed by the statute. Trifling variations not affecting the central ideas of the "officialness" and "indistinguishableness" of the ballot would be unimportant, but the Australian system with a total absence of an official ballot would be like the play of Hamlet with Hamlet left out.

"Elections are a contrivance of government, which prescribes who are electors and how they may express their will, and it is a legitimate exercise of power to prescribe the description of the ballot which shall be used." People ex rel. Nichols v. Board of County Canvassers of Onondaga County, 129 N. Y. 413, 29 N. E. 334, 14 L. R. A 630.

"These statutes [Australian ballot statutes] being designed to preserve the secrecy of the ballot, and to prevent fraud, intimidation, and bribery, will generally be considered as mandatory; and this will be so in all cases where the statute provides that a ballot varying from the requirements of the law shall not be counted." 6 Am. & Eng. Enc. Law, p. 348, note 8.

But even if that last-mentioned provision is lacking it (the statute) still is mandatory—

"if from a consideration of the entire act, its nature and its object, the consequences which would result from not construing it as mandatory would defeat the very objects of the Legislature." 36 Cyc. supra.

See, also, Tuntland v. Noble, 30 S. D. 145, 138 N. W. 291, 293, Ann. Cas. 1915A, 1004.

### Alaska Australian Ballot Statute.

Now, the same considerations which have led to the adoption elsewhere of the Australian system prevailed in Alaska and led the Legislature of 1915 to pass the act of that year. There was beginning to work here the sinister influence which led to

the downfall of the old system there. Owing to the fact that many men in remote localities in Alaska were markedly in the power of single influences, there was abundant opportunity for the stifling of a free expression of the opinion of the electorate. And, too, the political manipulator was already abroad in the land; the employer exerted pressure; men had been sent to jail by courts for election frauds; "the poison of the serpent was just entering the garden of Eden." The Legislature saw those evils and to its credit determined to remedy them. That Legislature was the second Legislature to convene after Alaska had been given the small measure of home rule which it now enjoys, and the very fact that an Australian ballot was provided at so early a period is evidence of the enormity of the evil, of the imperativeness of a change. Accordingly the Legislature enacted the law (Session Laws 1915, c. 25), and it received the approval of the Governor. How is it to be construed? Let us see.

## Our Act—How Construed.

Now, having in mind the former evil, the desirability of extirpating that evil and the means adopted to extirpate it, let us examine that statute in detail with a view of ascertaining the legislative intent.

By its first section a complete change is to be wrought in a thing which is of the very essence. Prior to the enactment every person voting prepared, or had some private person prepare for him, the ballot which he was to use at the election. Now the change. Says the statute:

"After the passage of this act, for all elections in the territory of Alaska * * * the clerk of the district court * * * shall prepare ballots for use in their respective divisions."

Prepare ballots for use—not prepare them as playthings to look at—but prepare them "for use." I cannot see that that can have any other meaning than this: "No other person shall prepare ballots" for use at the election. It seems to me that this construction is required not only by a consideration of the former evil, but also by the context to which allusion will be made later on in this opinion.

Section 2 provides that the ballot which the clerk is to prepare for use at all elections shall be printed upon white paper,

that it shall contain the names of all candidates nominated, and blank spaces to write in other names. We shall see later on that no one can write in any such names, however, except the voter himself or some of the officers for him in case of his disability.

Section 3 provides that this ballot shall be headed "Official Ballot." "Official" means:

"Derived from the proper office or officer or from the proper authority; made or communicated by virtue of authority; hence authorized, as an official statement or report." Century Dictionary, p. 409, Official.

"And at the top thereof above a perforated line shall be duplicate stubs bearing consecutive numbers, one of said stubs to be retained by the election judges upon presenting the ballot to the voter, the other stub to be torn from the ballot by the election judge and compared and retained upon the return of the voter from the voting booth."

This plainly indicates that this official ballot is to be handed to the voter by the judges, and that none but the official ballots are to be deposited in the ballot box, for on the return of the voter from the booth the judges are to "compare" the number still left on the ballot with the number which the judges have torn off, so as to be sure that the ballot which the voter presents is the very official ballot which the judges handed him. This is further accentuated by the fact that section 17 provides:

"That when a voter enters the voting place he shall be given an official ballot by one of the election judges with which he shall retire to the booth or screen and there mark the same for the candidates of his choice."

Section 10 provides that the words "official ballot," indorsed by the clerk of the court, shall appear on the outside of "every ballot." The object of this is to provide an additional check on the character of the ballot as being official (i. e., authorized), instead of nonofficial (i. e., not authorized). Why such precaution if a failure to vote the official ballot is a mere irregularity—if the use of the official ballot at elections is merely directory?

The act further provides that the clerk is to forward to the United States commissioner 100 of these official ballots for every 50 voters in the recording district and that the commissioners in those recording districts shall deliver the proper

number of such ballots to the judges of election in each precinct; and section 19 provides that when a ballot is marred by the voter he may receive a second, and if necessary a third, but no more, and that the marred ballots must be preserved by the judges of the election and placed with the unused ballots.

Section 19 provides:

"That any voter who is blind or otherwise incapable of marking his or her ballot, may demand that the judges of election assist him or her, and the judges of the election shall do so."

The judges of election shall do this. It is not left for some one else to do this. No one else can do it.

Section 24 provides a heavy fine for any officer who willfully and corruptly fails to do his duty under this act.

Section 30 provides:

"If any judge, inspector, clerk or any other officer of an election shall open or mark, by folding or otherwise, any ticket presented by such elector, at such election, or attempt to find out the names thereon, or suffer the same to be done by any other person, before such ticket is deposited in the ballot box, such judge, inspector, or clerk shall be guilty of a felony."

Section 34 provides against the unlawful printing, or distributing of these official ballots, and section 38 against the having of them in one's possession and against the counterfeiting of them.

I think the foregoing considerations of the evil to be remedied, the intent and manifest purpose of the Legislature to remedy it, the appropriateness and very efficacy of the remedy adopted, if mandatory, and the total insufficiency of a directory statute to remedy it, coupled with the provisions of the act heretofore mentioned clearly evidence the intention of the Legislature that no loophole should be left through which the old system could crawl back into vogue—clearly manifest their intention that no nonofficial ballot should be taken as the expression of the will of the electors or should have any efficacy whatsoever. In the very nature of things such must be the consequences of nonofficial ballots, else the entire act fails of its purpose and it might just as well not have passed. If, notwithstanding the statute designed to remedy the evil of open voting, notwithstanding the safeguards and the checks which the statute has thrown around the new system, voters are free-

ly permitted to cast nonofficial ballots, then indeed was the act of the Legislature but "a sounding brass and a tinkling cymbal."

There is, however, one other section of this act which, to my mind, adds to the considerations and provisions heretofore adverted to a prohibition of such positive nature as to remove all doubt about the character of the act, and that is the twenty-first section, which provides:

"That in any precinct where * * * no official ballots have been received, the voters are permitted to write or print their ballots."

This is equivalent to saying, "In no other case are they permitted to write or print their ballots." The first section had provided that the official ballot is the one which is for use at the elections, and the twenty-first section is the only section which provides for any emergency under which any other ballot is permitted to be cast; that therefore is the only emergency. This under the canon of construction known to all lawyers, "The expression of one is the exclusion of all others."

If the Legislature had expressly (i. e., in so many words) declared that a nonofficial ballot should not be counted, the matter of rejecting such ballots would not be open to question; fraud or no fraud, disfranchisement or not disfranchisement. Kirkpatrick v. Board of Canvassers, 53 W. Va. 286, 288, 44 S. E. 470, second column, where the court says:

"No cause has been brought to the attention of the court in which it has been held that where a mandatory statute has been violated it must be further shown that such violation was accompanied by actual fraud, in order to make the ballots invalid, and it is not believed that any such case exists."

And in the first column of same page:

"Such statutes are intended to prevent fraudulent voting, and, if the Legislature is of the opinion that the general good to be derived from their strict enforcement will more than counterbalance the evils resulting from the occasional throwing out of votes honestly cast, the courts cannot reconsider the mere question of policy."

In favor of the contention that our act is directory is only the fact that the act does not say in express terms that no other ballot than the official ballot shall be received or counted; but we have seen that the nature of an act as to being manda-

tory or directory is not determined by the form of the words but by the intent of the Legislature. It is mandatory—

"if from a consideration of the entire act, its nature and its object, the consequences which would result from not construing it as mandatory would defeat the very objects of the Legislature." 36 Cyc. supra.

Many an act is held to be mandatory although there are no mandatory words, and many an act is held to be directory although the words be mandatory. In construction of statutes and contracts, the law looks through the letter to the spirit; for "the letter killeth, but the spirit giveth life."

I think, therefore, that the act of 1915 was mandatory, and absolutely "prohibits the casting of any ballot but the official ballot, provided that, where no official ballots have been received the voter may write his own ballot." That is the one and only instance where a departure is authorized. It is not an exception; it is a proviso. Being a proviso in a general statute, he who relies upon the fact that any given case is within the proviso has the burden of proof, and the absence of proof of being within the proviso amounts to the same thing as prima facie evidence that the case is not within the proviso.

### Canvassing Board—Creature of Statute—Cannot Go Behind Returns.

Now, a canvassing board is a creature of statute, and its duties and powers are prescribed by statute. I think it will be conceded that the canvassing board cannot go behind the returns, but that they must canvass them and determine from them alone how much they shall credit to each candidate.

But what are the returns? The returns of an election are those papers, documents, and things, and only those papers, documents, and things, which the statute prescribes and orders to be sent to the officers designated.

"The question as to what papers constitute the official returns is purely a matter of statutory regulation." 15 Cyc. 376.

I think this is the universal rule and that the books will be searched in vain to find anything to the contrary.

Returning then to our statute on the subject, we find it provided by section 402 of the Compiled Laws of 1913:

"The election board at each polling place, as soon as the polls are closed, shall immediately publicly proceed to open the ballot box and count and canvass the votes cast, and they shall thereupon, under their hands and seals, make out in duplicate a certificate of the result of such election, specifying the number of votes, in words and figures, cast for each candidate, and they shall then immediately carefully and securely seal up in one envelope one of said duplicate certificates and one of the registers of votes, all the ballots cast, and all affidavits made, and mail such envelope with said papers enclosed at the nearest post office, by registered mail if possible, duly addressed to the Governor of Alaska at his place of residence, with the postage prepaid thereon."

These things required to be sent to the Governor and which according to the statute constitute the return are (1) the certificate of the election board as to the result of said election; (2) one of the registers of votes; (3) all the ballots cast; (4) affidavits (of challenged voters).

The canvassing board is to canvass and compile that return —not simply a part of that return. For the canvassing board to confine itself to a consideration of only a part of that return would not be to canvass that return. When the statute directed the duplicate register and all ballots to be sent to the Governor, in addition to the certificate of the judges, it must have had an object in so doing. If the canvassing board is to take the certificate as the be all and end all of the returns, if the canvassing board is a mere adding machine, to totalize the votes as certified by the election board, why the requirement that the registration book and the ballots be sent to the board? Why not simply provide that the certificate of the judges be sent? The very object and purpose of requiring the register of votes and all ballots to be sent along with the certificate, and making them a part of the return, must have been so that they may all come under the eye of the canvassing board, the one acting as a check upon the other, and that from the return as a whole the canvassing board shall add the figures of votes cast in any given precinct to the other returns likewise canvassed.

Let us suppose the board to canvass only a part of the return. It might well happen that in the part not canvassed something appears which absolutely nullifies the effect of that part which is canvassed, or renders the whole return so uncertain and indefinite that it cannot be intelligently canvassed at all. For instance: The register of votes is as much a

part of the return as the certificate of the election board, and so also are the ballots. Now suppose that that part of the return which is called the register of votes should show that in a given precinct only 150 votes were cast and that the number of ballots returned was 250, and that the certificate of the election board showed that one of the candidates received 1,136 votes and the other candidate 64 votes in that precinct, it would be very evident that the certificate and the registration book and the ballots could not all speak the truth. The canvassing board surely would have to reject that entire return, for each part thereof would be utterly antagonistic to every other part thereof, and all cannot stand; and the canvassing board could not go behind the return to find out which part of the return was true and which was false. If, however, the return, taken altogether, speaks intelligently, the canvassing board must hear what it says.

### Choggiung.

Opening, then, the return—the sealed envelope from the Choggiung precinct, for instance—for the purpose of canvassing return from that precinct, what did the canvassing board find? The answer is that it found the return from that precinct consisting of (1) certificate from the election board that Wickersham had received 25 and Sulzer 3 votes; (2) register of voters, showing 28 votes cast; (3) 28 nonofficial ballots, being the 28 votes aforesaid. Here the return is speaking and it is speaking intelligently. There is no doubt or uncertainty as to what it says—no occasion for construction. It means what it says, and it cannot be taken to mean more than it says. Each one of these pseudo ballots has a voice that cries, "I am a pretender;" 28 distinct and separate voices from Choggiung— all there are in Choggiung—crying in no uncertain tone:

"I am a pretender; look at me; you·can see it in my face. I am no real ballot, such as the law requires a freeman to cast if he would make known his preference. I am only a slip of paper—an outcast by the law."

And so they are—pretenders, all of them; looking at them one can tell. To tell that is not to exercise "discretion" or "judgment." It is but to open one's eyes and take in the things that appear; to be attentive and hear the voices that speak.

5 A.R.—40

And this language of self-denunciation which each of these ballots speaks is not contradictory of the certificate of the judges. It is in perfect consonance with what the judges say.

They, the judges, say by their return inclosing these slips of paper:

"There were 28 nonofficial ballots cast in Choggiung, of which 25 bore the name of Wickersham and 3 bore the name of Sulzer."

They might just as well have said:

"Twenty-eight electors met together in Choggiung, and viva voce 25 were for Wickersham and 3 were for Sulzer."

They might just as well have said:

"Twenty-eight electors met together in Choggiung and cast 28 pebbles into a box; 25 of the pebbles were white, and by agreement are for Wickersham; 3 of the pebbles were black and by agreement are for Sulzer."

The statute says that the canvassing board shall issue the certificate to "the person who has received the greatest number of votes." It says that the voting shall be by the "official ballot." .Are such things ballots? Are such things votes? Do they express a preference in the manner required by law? If not, they have no validity whatsoever, cannot be cast, cannot be counted. A nonofficial ballot is not a ballot at all; it is not simply an illegal ballot; it is a void ballot. If a nonofficial ballot cannot be cast, it certainly cannot be counted. If the nonofficial ballots from Choggiung are to be counted, then why not count all nonofficial ballots? And if this is to be done, what is the necessity of any official ballots?

Undoubtedly there are many cases which hold that the canvassing board has no authority to count the ballots, to even look at them, to even hear their voices; but they are all cases where the ballots are no part of the return to be canvassed. With us they are, and, being a part of the return, it is just as much the duty of the canvassing board to canvass them as it is to canvass any other papers or things constituting the return, for—

"in arriving at the result of an election, the canvassing board is not to consider the judges' certificate alone, or any other constituent of the returns, as a controlling force, but all are to be considered." Patten v. People, 63 Ill. App. 617.

And so our canvassing board is not authorized by any statute to accord more importance to the certificate of the board than to the register of votes or the ballots. All of these are a part of one return. They all come to the canvassing board in one and the same envelope from one and the same source, vouched for by the same persons. All are of equal authenticity and importance, and in this case, all say one and the same thing in the same language.

When the canvassing board saw this return it was its plain duty to reject it because it showed on its face that there had been no election held at Choggiung. This would involve no act of discretion—it would be but to obey the plain terms of the law, for—

"where election returns are false upon their face and show reckless disregard of the terms of statute they should be disregarded altogether." Cyc. 381.

In State v. McElroy, 44 La. Ann. 798, 11 South. 134, 16 L. R. A. 280, 32 Am. St. Rep. 356, the court say:

"The question for our determination is: Should a ballot cast be counted in ascertaining the result of an election, on the face of which the printed name of a candidate was erased, and the name of another candidate substituted in writing? Under the act of 1877, to regulate and maintain the freedom and purity of elections, and to punish persons for false, fraudulent, or illegal voting, the names of persons voted for were required to be written or printed on one ticket. The statute applying is: Section 23 of the said act was amended by Act 101 of 1882, as follows: 'That all the names of persons voted for shall be printed on one ticket or ballot on white paper, of uniform size and quality, to be furnished by the secretary of state.' The right of suffrage being a political and not a natural right, it is within the power of the state to prescribe how it shall be exercised. The manner of voting, provided by statute, is one of the reasonable regulations. The limitations imposed for the purpose of guarding against fraud, undue influence, and oppression, and of maintaining the secrecy of the ballot, are within the legislative and police powers. That the ballots shall be printed does not add to the constitutional qualifications of the voter, and therefore falls within the general authority of legislative laws.

"The legislative intent is clearly expressed. In the first act, that of 1887, the words were, 'the ballot shall be written or printed'; in the amending act, 'it shall be printed.' The legislative will cannot be misunderstood. The intention of the Legislature should control absolutely. When that intention is clearly ascertained, those upon whom it devolves to execute the statute have no other duty than to follow the legislative will. * * * While all the minute details of

the statutes relating to elections are not mandatory, they are mandatory in requiring that the ballots shall be printed. The positive requirement of the statute does not admit of its being treated as merely directory. By qualifying. a statute as directory its requirement is avoided; the intention of the Legislature, however plain, is defeated. It is desirable that the Legislature should declare in what respect they mean any particular provision to be void, in event of noncompliance with its terms, and what consequence they intend shall result from noncompliance. In the absence of this, great difficulties arise. We are not willing, however, in the absence of such a declaration, to hold a law as directory in cases in which the intention of the Legislature is clearly and emphatically expressed. We prefer a strict construction to the 'extensive and comprehensive.' Each has able advocates and many authorities in its support.

"The grounds of objection urged on the part of the respondent, such as that the purpose of voting is to ascertain the intention of the voter and the will of the majority, and that a ballot cast by an elector in good faith should not be rejected for failure to comply with the law in matters over which he had no control, if broadly and liberally applied, would defeat the object of the statute relating to the printing of the tickets on a ballot of white paper, furnished by the secretary of state, and would render ineffectual the provisions applying to the throwing out and not counting folded tickets, and even those relative to the required certificate of registration, although the purpose of the law is well defined and clear. Constitutional and statutory provisions for the conduct of elections are either mandatory or directory, and a violation of mandatory provisions will avoid the election, without regard to the motive, or the person guilty of the violation, and without reference to the result. 6 Am. & Eng. Ency. of Law, 325.

"In Rhode Island the law requires that each ballot shall be so printed as to give each voter a clear opportunity to designate by cross-marks, in a sufficient margin at the right of the name of each candidate, his choice of candidates, and that each voter shall prepare his ballot by marking in the appropriate margin or place, a cross opposite the name of the candidate of his choice, and that no voter shall place any mark upon his ballot by which it may be afterward identified. The court decided that no mark other than the cross can be used; that it must be placed in the margin opposite the name of the candidate. Amer. Dig. of 1891, 1419. In many of the states there are statutes prescribing the form of the ballots, the kind of paper, and prohibiting any marks, figures, or devices by which one can be distinguished from another. These statutes, being designed to preserve the secrecy of the ballot, and to prevent fraud, intimidation, and bribery, will generally be considered mandatory. 6 Am. & Eng. Ency. of Law, 349. Directions given by a sovereign in regard to a matter over which his power is conceded, would, according to the ordinary use of language, be held to involve, as its correlative, obedience. Sedgwick's Statutory and Constitutional Law, 318, note.

"These decisions maintain the principle that mandatory provisions

not complied with in an election will result in its avoidance, without reference to motive or person. In those states in which the ballots must be printed, and the name of the candidate designated by cross-marks, the required marginal notes must be placed as required by statute. That the voter should readily comply with the legislative will is clearly expressed. The voters who cast the 67 ballots did not comply with the statute. In an organized state of society the majority bind the minority by complying with mandatory laws in expressing the popular will.

"Judgment affirmed, at appellant's costs."

## No Return from Choggiung that No Official Ballots Had Been Received for the Election There—Hence Canvassing Board Not to Presume That They Had Not Been Received.

I say it was the duty of the board not to count the returns from Choggiung precinct, because the ballots, which are a part of the return, show on their face that they were void and there was nothing on the face of the returns to militate against this fact.

There is not in the returns any certificate of the judges of election as to the facts, if any there were, which prevented the use of the official ballots. The twenty-first section of the said statute of the Alaska Legislature of 1915 provides that, where no official ballots have been received, "the voters are permitted to write or print their ballot, but the judges of election shall in this event certify to the above facts which prevented the use of the official ballots, which certificate must accompany and be a part of the election returns." So that it is seen that, in addition to the requirements of the act of Congress as to what the return consists of, the Legislature has made another requirement to be complied with under a certain condition of affairs. The clear inference is that when there is no such certificate there are no such facts as call for such certificate. Certainly the canvassing board had no power to presume that any such facts existed. The return speaks intelligently and conveys a clear meaning, and the canvassing board cannot go behind this return.

It is contended that the election officers are presumed to have done their duty by not allowing nonofficial ballots to be cast except for good reason, and have simply neglected to certify as to the facts justifying their action—that the canvassing board will presume that. If the canvassing board can indulge

in any presumption at all, it would seem that it must be the presumption that no such facts existed else the certificate would have stated them. If, by virtue of the presumption that the officers of election have done their duty, the canvassing board is to infer that no official ballots had been received at Choggiung, what becomes of that equally as strong presumption that, if the official ballots had not been received, the election board would have done its duty and. stated that fact in the petition; and what becomes of that other equally as strong presumption that the clerk of the court performed his duty to mail the official ballots to the commissioner of the recording precinct in time for the commissioner to receive them before election, that the commissioner performed his duty of mailing the proper number to the judges in time for the judges to receive them, and that the United States mail did its duty by duly carrying and delivering to the addressee such mail matter as it deposited in the post office?

But the truth is that this is not a matter for the presumption of the canvassing board. It is a matter of plain language. The statute says: "But in this event the facts which prevented the use of the official ballots" must be stated in a "certificate which must accompany and be made a part of the election returns." The statute thus says what evidence the canvassing board must have before it before it can count unofficial ballots, and it can substitute none other—least of all a nebulous presumption.

It is urged that if in fact no official ballots had been received in Choggiung, and the voters were obliged to make their own ballots or not vote, then to reject the return from Choggiung is to disfranchise all the voters in that precinct, for no fault of their own, but simply because the election board omitted to certify to the fact which was the cause of no official ballot being cast. This in a sense is true; on the other hand, it is likewise true that if in that one precinct official ballots had been received, but the election judges had not required them to be used, and if in all the other precincts the lawful ballots had been used, and the 28 unlawful votes at Choggiung would change the result, then all who voted lawfully for Sulzer are disfranchised by the 25 in Choggiung who cast the prohibited ballots for Wickersham—I say disfranchised for to nullify

by a prohibited ballot the effect of a lawful ballot is virtually to disfranchise the voter of the lawful ballot.

But in truth and in fact the argument of possible disfranchisement does not enter into the case, for the "official ballot" is the only instrument by means of which the elector can express his will at the election, save in the exceptional case provided for in section 21.

"The answer is that when an elector attempts to express his will at an election by the use, through either design or accident, of ballots which the law declares shall not be counted, the courts have no power to help him. Had these ballots been misplaced by design or some preconcerted arrangement between the county clerk and the candidates whose names appear thereon, or some of them, the voters using them might be as innocent then as they appear to be in the case at bar: but to hold, under such circumstances, that the votes must nevertheless be counted, would be to suggest an easy method of defeating the fundamental purpose of the statute." State ex rel. Nichols v. Board of County Canvassers of Onondago County, 129 N. Y. 408, 29 N. E. 333, 14 L. R. A. 629.

"The final deposit of a legal ballot in the box is the act of voting. It matters not that one sign the roster, * * * and formally present to the election officers what purports to be his ballot; nevertheless, if such ballot is not expressive of any wish or preference of the voter which under the law may be considered and given effect; such person has not voted and his vote should not be counted, even in the determination of the number of persons who voted at the election." City of Inglewood v. Kew, 21 Cal. App. 611, 132 Pac. 783.

Again, the action of the canvassing board neither enfranchises nor disfranchises any voter. It sits merely to determine to whom to issue a certificate of election. This certificate of election is not final. The House of Representatives is the tribunal before which the contest of election comes. In its wisdom it may say if it chooses:

"It is true that the certificate of the judges of election does not state that no official ballots were received at Choggiung but it is possible—probable, even—that none were received, and that is the reason the judges allowed these otherwise prohibited ballots to be used, and by inadvertence or neglect they omitted to say that was the reason. At any rate we will investigate the matter; we will hear oral testimony; we will consider affidavits or get at the very truth of the matter in some other way."

Or even, if the election board had actually certified that no official ballots had been received and that was the reason none

had been cast or returned, still the House could go behind those returns in investigating the matter. It could say:

"The matter is suspicious. It is not likely that no official ballots had been received. Choggiung is a cannery site in the western part of Alaska. Very likely the cannery boss is also the boss of voters. We are not disposed to believe this certificate of the judges. We will take extraneous testimony about those nonofficial ballots."

These things the House of Representatives could do and say, because it is clothed with plenary power to seat whomsoever it pleases—certificate or no certificate. But the canvassing board has no such power. It can consider only the returns as made to it, and it cannot allow those returns to be supplemented by extraneous affidavits, or, by indulging in presumptions, make them say what they do not say. Besides, as above stated, if they are going to indulge in any presumption which presumption are they to indulge in?

"The board has no power to procure corrected returns or to receive testimony aliunde either to sustain or to invalidate these returns." 15 Cyc. note 5, and cases cited, p. 385.

All the argument about disfranchising the voter, then, might be appropriate if made to the House of Representatives on the contest of election, but it has no application to the duties of the canvassing board; but I doubt that the argument is entitled to much weight wherever made, for the reason that the elective franchise is not one of the natural rights of man but from the earliest times has always been hedged about with some restrictions of positive statutory enactments.

"Elections are a contrivance of government, which prescribes who are electors and how they may express their will, and it is a legitimate exercise of power to prescribe the description of ballots which shall be used." Oglesby v. Sigman, 58 Miss. 502, cited in People v. Board, 129 N. Y. 395, 29 N. E. 327, 14 L. R. A. 630.

Notwithstanding incidental disfranchisement—

"we would still be obliged to hold that it would be far better that their votes should be deemed ineffectual than that the fundamental purpose of an important public statute should be subverted, and, in the struggle to save these votes by judicial construction, the door should be thrown open for evasions of the statute which might revive evils far more dangerous to the public welfare than can possibly, * * * follow the exclusion of a few hundred votes in a single county." 14 L. R. A. p. 630.

See, also, Slaymaker v. Phillips, 5 Wyo. 453, 40 Pac. 971, 42 Pac. 1050, 47 L. R. A. 842; Orr v. Bailey, 59 Neb. 128, 80 N. W. 495.

In other words:

"Much better that a few voters of Choggiung should lose their votes than that the positive requirement for an official ballot should be made a thing of shreds and patches."

### Nushagak and Bonnifield.

By the answer of the canvassing board the precincts of Nushagak and Bonnifield are in the same category as Choggiung. Choggiung, Nushagak, and Bonnifield total Wickersham 37, Sulzer 7.

### Deering and Utica.

The answer of the canvassing board as to the precincts of Deering and Utica is also substantially the same as that as to Choggiung. It contains, however, the statement of two of the canvassing board, made in their answer to the alternative writ, that said board is now in receipt of a telegram from Adams, the clerk of the court at Nome, that:

"Certificate Utica judges issued January 18th showing why official ballots not used received to-day; affidavit of one certificate of second judge of election Deering precinct dated February second of same tenor also received; copies mailed."

A certificate or affidavit made after election returns have been forwarded to and received by the canvassing board is of no avail. Such is not a part of the return which the canvassing board can consider. Congress might consider it, but the board cannot.

"Only such papers as the statute requires may be regarded as election returns. If the officers go further and make statements on their own responsibility such statements should be disregarded." 15 Cyc. 376.

"It was held that such paper (extraneous evidence) was properly excluded as the judges of election had no right to make such statements, it not being one of their prescribed duties." Smith v. Lawrence, 2 S. D. 185, 49 N. W. 7.

No other certificate of the officers of election than that provided by statute should be made, and, if made, should be disregarded.

"Where a certain kind of return is required to be made, and the manner of making it is provided for, and the statute is silent beyond

that, then the return required to be made is the only return which the law will recognize." Hughes v. Parker, 63 Kan. 297, 65 Pac. 271.

It is obvious then that the receipt of the telegram cannot change the situation. The situation is exactly the same as it was when the return was received with nonofficial ballots and no certificate of judges as to why they were used. The return from these precincts of Utica and Deering, then, are substantially in the same category as those from Choggiung, Nushagak, and Bonnifield. Deering and Utica total Wickersham 23, Sulzer 10.

### Vault.

As to the precinct of Vault, the allegation of the petition is that:

"No certificate of the result of the election in said precinct specifying the number of votes cast for each candidate accompanied or was included in said returns."

It is admitted in the answer of the canvassing board that the judges did not sign any such certificate, but it is further alleged that:

"The canvassing board received from the clerk of the United States district court for the Fourth judicial division, in which said precinct is located, the 'certificate of clerk to election returns,' bearing the names of the election judges for said voting precinct and duly certified by the clerk of the court as a full, true, and correct copy of the original on file in his office."

The statute provides that the judges of each election precinct shall be three in number (C. L. § 396, last paragraph); that "the judges constituting the election board" (i. e., these judges or a majority of them) shall make the return "under their hands and seals" in duplicate, all except ballots; that one duplicate of their certificate and the register of voters shall be sent to the clerk of the court (under their hands and seals), and that the other duplicate and all ballots shall be sent to the canvassing board; that the canvassing board shall canvass what is sent to them, but that, in case no such return is received by them, they are to canvass the certificate of election which the election board sent to the clerk of the court under their hands and seals. It will be seen that the said two members of the canvassing board say in substance that they received no returns from the election board and proceeded to

canvass a certified copy of some certificate made by the clerk of the election. If they did, then what they canvassed was not properly authenticated. It is not the clerk who is to sign the certificate of election. It is the election board. Consequently the certificate of the clerk of the election to the clerk of the court is not the certificate required by law.

"The return must be authenticated by the official certificate and signature of the election board, and according to the weight of authority 'it is essential to the validity of the returns that it bear the signatures of a majority at least of the officers who conducted the election.' 15 Cyc. 376, 4, and cases from Illinois, Maine, Massachusetts, Oregon, and Texas, cited in note 47, especially Simon v. Durham, 10 Or. 52, the 'purport of which is expressed in the syllabus, as follows:

"*Election Returns—Canvassing Boards.*—A board of canvassers, in the exercise of ministerial functions only, have no power, in making their canvass, to consider as election returns any paper not duly authenticated in the mode provided by the statute.

"*Idem—Authenticated Papers Cannot be Considered.*—An attempted canvass, in which the result declared is based upon papers not thus authenticated, may be treated as a nullity by the party injured, and unless the powers of the board have otherwise terminated, he is entitled to the writ of mandamus to compel them to reconvene and make a legitimate canvass of the proper returns."

By statute, in some jurisdictions, it is made the duty of the canvassers to send for new and amended returns to be signed by the proper parties (15 Cyc. 379, 10), but we have no such statute.

The returns from Vault, then, not being authenticated by the proper officers, cannot be canvassed. Vault totals Wickersham 8, Sulzer 2.

### Nizina.

As to the precinct of Nizina: The allegation in the petition is:

"That no official ballot was used at Nizina, and that the return contained no certificate explaining the facts which prevented the use of the official ballot."

The truth of this allegation is not denied in the answer of Messrs. Strong and Davidson, of the canvassing board, to the alternative writ of mandamus. Under the strict rules of pleading, therefore, the allegation would be taken as admitted. The said answer, however, does state that:

"So far as the canvassing board could determine the only irregularity shown on the face of the returns was that one of the three election judges had sworn the other two, but there was nothing to show that he had himself been sworn, although he had signed the oath form with the other two judges."

If the allegation in the petition is true, then Nizina is in the same category as Choggiung, Nushagak, and Bonnifield; if the allegation in the answer is true, then I am of the opinion that that is an irregularity only—not going to the essence of things, but only to their form, and hence is directory only.

"The board could not reject the returns if a majority of the judges were sworn and signed." Tanner v. Deen, 108 Ga. 95, 33 S. E. 832.

Whichever is taken as true, it could not affect the ruling on this demurrer, for Nizina totals only Wickersham 7, Sulzer 5.

### Recapitulation.

To recapitulate, then, the canvassing board must not count the returns from Choggiung, Nushagak, Bonnifield, Utica, Deering, or Vault. These precincts total Wickersham 69, Sulzer 19.

It is suggested by Mr. Rustgard that, if the court had before it the returns from all the precincts in Alaska, it might appear that there were defects in the returns from other precincts sufficient in gravity and number to turn the result obtained if the ballots (?) in the precincts discussed herein were rejected.

This of course, is possible, but the pleadings disclose nothing of that nature. On the contrary, the answers allege that, counting the precincts heretofore adverted to, Wickersham has 6,490 votes, and Sulzer has 6,459; that the canvassing board has finished the canvass of all votes and was about to issue a certificate of election to Wickersham when the alternative writ was served upon them.

It is obvious that, if the votes be rejected which the court has decided should be rejected, Wickersham's 6,490 will suffer a diminution of 69, leaving him only 6,421, and Sulzer's 6,459 will suffer a diminution of 19, leaving him 6,440, in which event the certificate of election should go not to Wickersham, but to Sulzer.

The demurrer will be sustained.